[Civ. No. 28231. First Dist., Div. One. Nov. 5, 1971.]

ALICE SILVERHART, Plaintiff and Appellant v.
MOUNT ZION HOSPITAL, Defendant and Respondent.

1024

**COUNSEL**

David P. Weaver, Jr., and Jay R. Mayhall for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, Chris G. Gasparich and Raoul D. Kennedy for Defendant and Respondent.

**OPINION**

**MOLINARI, P. J.**—This is an appeal by plaintiff from a judgment for defendant hospital in an action for damages allegedly sustained by plaintiff when a surgical needle broke during a surgical operation and became permanently lodged within plaintiff's body.

In December 1964 plaintiff entered defendant hospital for a vaginal hysterectomy to be performed by Dr. K. Warren Newgard, a specialist in the field of obstetrics and gynecology and a member of the staff of said

hospital. Dr. Newgard, a practicing surgeon with over 26 years' experience, considered the contemplated surgery to be "routine."

During the operation, while Dr. Newgard was inserting the first suture in the vaginal area, a surgical needle broke and two-thirds of the sharp end of the needle receded into the lower pelvic area, where it has remained imbedded.[1] Dr. Newgard proceeded with the operation and plaintiff had a normal convalescence.

Dr. Newgard testified that there are two major types of half-round surgical needles, one of which is heavier and contains greater tensile strength than the other. The heavier needle is called a Mayo needle and the lighter one, a Fergusson needle. Dr. Newgard has a standing order with the hospital that in vaginal surgery he is to be supplied solely with the Mayo surgical needle.[2]

At the commencement of the trial, plaintiff's counsel submitted a trial memorandum which advised the court that one of the issues to be raised was strict liability in tort. Counsel also mentioned this theory to the jury in his opening statement. At the conclusion of the trial, plaintiff submitted jury instructions which included one covering strict liability in tort. The court refused to give this instruction and submitted the issue of the hospital's liability to the jury solely on the theory of negligence. The jury returned a verdict for defendant hospital and against plaintiff.[3]

Plaintiff first contends that the court erred in not instructing the jury that defendant was strictly liable in tort if the needle was defective.

The doctrine of strict liability in tort was first applied in this state in *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], a case involving a manufacturer of a product. In that case the rule of strict liability was stated thusly: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (At p. 62.)

[1]Dr. Newgard conferred with Dr. Leonard D. Rosenman, chief of the department of surgery at Mount Zion Hospital. Both were of the opinion that since the needle was buried in dense tissue, it could not become displaced and would not be a threat to plaintiff's well-being. X-rays taken after the operation revealed that the needle was still in a fixed position.

[2]There was no direct evidence as to whether the needle actually used was a Mayo needle. Dr. Newgard assumed that he had been handed a Mayo needle. He testified, however, that it was possible for a nurse to hand him a needle that was not a Mayo needle.

[3]Dr. Newgard was also joined in the action as a party defendant but the action against him was settled out of court.

Subsequent cases have expanded the scope of the *Greenman* doctrine by imposing strict liability on retail dealers (*Vandermark* v. *Ford Motor Co.,* 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168]); wholesale and retail distributors (*Barth* v. *B. F. Goodrich Tire Co.,* 265 Cal.App.2d 228, 252-253 [71 Cal.Rptr. 306]); home builders (*Kriegler* v. *Eichler Homes, Inc.,* 269 Cal.App.2d 224, 226-227 [74 Cal.Rptr. 749]); bailors and lessors of personal property (*McClaflin* v. *Bayshore Equipment Rental Co.,* 274 Cal.App.2d 446, 452 [79 Cal.Rptr. 337]; *Price* v. *Shell Oil Co.,* 2 Cal. 3d 245, 253 [85 Cal.Rptr. 178, 466 P.2d 722]); and licensors of chattels (*Garcia* v. *Halsett,* 3 Cal.App.3d 319, 325 [82 Cal.Rptr. 420]). ■ The standard of strict liability has been held to apply to a defect in design as well as a defect in manufacture (*Pike* v. *Frank G. Hough Co.,* 2 Cal.3d 465, 475 [85 Cal.Rptr. 629, 467 P.2d 229]; *Putensen* v. *Clay Adams, Inc.,* 12 Cal.App.3d 1062, 1072 [91 Cal.Rptr. 319]) and extends not only to actual consumers or users but to any human being to whom an injury from the defect is reasonably foreseeable. (*Elmore* v. *American Motors Corp.,* 70 Cal.2d 578, 585-587 [75 Cal.Rptr. 652, 451 P.2d 84]; *Johnson* v. *Standard Brands Paint Co.,* 274 Cal.App.2d 331, 338 [79 Cal.Rptr. 194]; *Putensen* v. *Clay Adams, Inc., supra.*)

A significant common element running through the cases is that each of the defendants against whom the standard of strict liability has been applied played an integral and vital part in the overall production or marketing enterprise. At the very least the defendant in each case was a link in the chain of getting goods from the manufacturer to the ultimate user or consumer. (See *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 62; *Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 262; *Price* v. *Shell Oil Co., supra,* 2 Cal.3d 245, 250-251; *Kriegler* v. *Eichler Homes, Inc., supra,* 269 Cal.App.2d 224, 227; *Barth* v. *B. F. Goodrich Tire Co., supra,* 265 Cal.App.2d 228, 253-254; *Garcia* v. *Halsett, supra,* 3 Cal.App. 3d 319, 325-326.)

Plaintiff seeks to extend the doctrine of strict liability to a hospital that furnishes, in connection with the care and treatment of a patient, a product that proves to have a defect that causes injury to the patient. The theory upon which she seeks to predicate such liability is that the hospital is a "supplier" of such product and, therefore, should be subject to the same standard of liability as any other supplier of articles or products.

In *Magrine* v. *Krasnica,* 94 N.J. Super. 228 [227 A.2d 539], affirmed 100 N.J. Super. 223 [241 A.2d 637], and 53 N.J. 259 [250 A.2d 129], the court declined to apply the doctrine of strict liability to a dentist whose drill, with a latent defect, broke while he was working on his patient, causing injury to the patient. The court stated, "Of . . . meaningful sig-

nificance is a recognition that the *essence* of the transaction between the retail seller and the consumer relates to the *article sold.* The seller is *in the business* of supplying the product to the consumer. It is that, and that alone, for which he is paid. A dentist or a physician offers, and is paid for, his professional services and skill. That is the *essence* of the relationship between him and his patient." (94 N.J. Super. at p. 235 [227 A.2d at p. 543].)

The foregoing statement in *Magrine* was cited with approval in *Carmichael* v. *Reitz,* 17 Cal.App.3d 958, 979 [95 Cal.Rptr. 381]. In *Carmichael* it was held that the doctrine of strict liability did not apply to a doctor who prescribed a drug which produced untoward results in a patient. In that case we find the following rationale: "[T]here is a difference in status or classification between those upon whom the courts have heretofore imposed the doctrine of strict liability and a physician who prescribes an ethical drug to achieve a cure of the disorders for which the patient has sought his professional services. The former act basically as mere conduits to the distribution of the product to the consumer; the latter sells or furnishes his services as a healer of illnesses. The physician's services depend upon his skill and judgment derived from his specialized training, knowledge, experience, and skill. The physician prescribes the medicine in the course of chemotherapy only as a chemical aid or instrument to achieve a cure. A doctor diagnosing and treating a patient normally is not selling either a product or insurance. One of the requisites which the Restatement prescribes for the imposition of strict liability is that 'the seller is engaged in the business of selling such product.' (Rest.2d Torts, § 402A.)" (See com. f.)

We are persuaded that the rationale of *Magrine* and *Carmichael* applies with equal force to a hospital in the exercise of its primary function which is to provide medical services. A hospital is not ordinarily engaged in the business of selling any of the products or equipment its uses in providing such services. ▇ The essence of the relationship between a hospital and its patients does not relate essentially to any product or piece of equipment it uses but to the professional services it provides.[4]

In the present case, the process of manufacturing and distribution ended with the person or firm that sold, leased or otherwise supplied the defective needle to defendant. The needle which was first placed on the market by the manufacturer left the stream of commerce when it came into defendant's possession. The needle then became a part of the surgical equipment of

---

[4]We apprehend that this principle does not apply where the hospital is engaged in activities not integrally related to its primary function of providing medical services, such as the situation where the hospital operates a gift shop which sells a defective product.

the hospital that was made available to surgeons for use in surgical procedures and as a part of the hospital's medical services. In sum, the hospital itself was a *user* of the needle since such needle was supplied to the hospital for its use in performing medical services incident to the normal and ordinary business of the hospital.

We are persuaded, moreover, that the rule of strict liability adopted by the courts of this state precludes the application of that doctrine to a hospital under the circumstances of this case. That rule, as stated in the Restatement Second of Torts, section 402A, and adopted by our Supreme Court in *Pike,* is as follows: "(1) *One who sells* any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the *ultimate user or consumer,* or his property, if (a) the *seller is engaged in the business of selling such a product,* and (b) it is expected to and does reach *the user or consumer* without substantial change in the condition in which it is sold. . . ." (Italics added; Rest.2d Torts, § 402A, pp. 347-348; *Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 475.) Under this rule a hospital furnishing a surgical needle as part of the medical services it provides is not a seller engaged in the business of selling such needles but a user or consumer of such a needle, as was Dr. Newgard to whom such hospital facilities were made available in the performance of his professional services.

In view of the foregoing we conclude that it does not subserve the policy considerations which gave rise to the strict liability doctrine to extend its standard of liability to defendant hospital as the user of a defective product in the course of its primary function of providing medical services. Its liability, if any, would depend on whether it was negligent or guilty of intentional misconduct. (See *Gagne* v. *Bertran,* 43 Cal.2d 481, 487 [275 P.2d 15].)

Plaintiff next contends that the court erred in not sending the jury out for further deliberations when some of the jurors expressed confusion with respect to the polling procedure. In this connection we note the provisions of section 618 of the Code of Civil Procedure which, in pertinent part, provides: ". . . The verdict . . . must be read to the jury by the clerk, . . . and the inquiry made whether it is their verdict. Either party may require the jury to be polled, which is done by the court or clerk, asking each juror if it is his verdict. If upon such inquiry or polling, more than one-fourth of the jurors disagree thereto, the jury must be sent out again, but if no such disagreement be expressed, the verdict is complete and the jury discharged from the case."

In the present case when the jury returned with its verdict in favor of

defendant and the court received an affirmative response to its inquiry whether such was its verdict, counsel for plaintiff requested that the jury be polled. Upon such polling by the court eight jurors stated that the verdict read by the clerk was their verdict; three said it was not, and one juror responded "Yes I voted." The court thereupon, in response to an inquiry by a juror, took another poll of the jury.[5] Upon the repolling 10 jurors said it was their verdict, and two said it was not. The court then directed that the verdict be recorded.

In considering plaintiff's contention, we first observe that no objection was made by plaintiff's counsel to the polling procedure at the time the jury was polled, nor did her counsel suggest that the jury be sent out again on the ground that more than one-fourth of the jurors disagreed with the verdict as returned. If plaintiff's counsel was not satisfied with the polling procedure, or if he believed that the jury was still confused, he should have complained immediately. ■ Since any impropriety could have been cured if raised on time, the failure to object amounted to a waiver of the alleged impropriety or error. (*Brown* v. *Regan,* 10 Cal.2d 519, 523-524 [75 P.2d 1063]; *Sherwood* v. *Rossini,* 264 Cal.App.2d 926, 930-931 [71 Cal. Rptr. 1]; *Kirby* v. *Adcock,* 116 Cal.App.2d 570, 571 [253 P.2d 700].) We perceive, moreover, that there was no impropriety or error in the polling procedure or in the return of the verdict. ■ We not only note the rule that all reasonable inferences must be indulged on appeal to support, rather than to defeat, the jury's verdict and the judgment thereon (*Snodgrass* v. *Hand,* 220 Cal. 446, 449 [31 P.2d 198]), but that it is clear that in the instant case 10 jurors unequivocally stated that the verdict returned was his or her verdict. Accordingly, no disagreement was expressed within the meaning of section 618 since the agreement of only nine jurors was required to reach a verdict. (*Kritzer* v. *Citron,* 101 Cal.App.2d 33, 36 [224 P.2d 88]; see *Earl* v. *Times-Mirror Co.,* 185 Cal. 165, 182-185 [196 P. 57]; and see *Randles* v. *Lowry,* 4 Cal.App.3d 68, 71 [84 Cal.Rptr. 321].)

Plaintiff's final contention is that the court erred in not granting her motion for new trial in view of a declaration of one of the jurors to the effect that the jury was summoned to announce a verdict before three-fourths of the jurors had reached a decision. The subject declaration was made by a juror who on both pollings of the jury had stated that the verdict returned by the jury was her verdict. In such declaration she declared that

---

[5]The juror inquired "Does this mean how we voted in the jury room or . . . ." The trial judge responded: "Ladies and gentlemen, it is so plain and simple, I can't understand this. You will answer whether you yourself, individually, voted for this verdict yourself; Yes or No. For yourself only. . . . Voted in the jury room. That's the only place you voted. Yes or No, this is your verdict. Is this your own personal verdict? . . . Whether you voted for this verdict, Yes or No."

at the time the bailiff of the court was summoned and was informed that the jury had reached a verdict, three-fourths of the jury was not in agreement as to a verdict and that she herself was undecided and wished to have further testimony read. She also declared that when the jury was polled she "felt compelled, as it appeared others did also, to assent to the verdict which was read aloud by the clerk." This declaration was received and considered by the court on the motion for new trial.[6]

Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or to dissent from the verdict or concerning the mental processes by which it was determined."

In *People* v. *Hutchinson,* 71 Cal.2d 342, 349-350 [78 Cal.Rptr. 196, 455 P.2d 132], it is declared that the only improper influences that may be proved under section 1150 to impeach a verdict are those open to sight, hearing, and the other senses, and thus subject to corroboration, and that the limitation of impeachment evidence to proof of overt conduct, conditions, events and statements precludes one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. In the present case the juror's declaration was inadmissible because it showed only her mental processes and those of her fellow jurors, and the subjective considerations which influenced her verdicts. (See *People* v. *Stevenson,* 4 Cal.App.3d 443, 444-445 [84 Cal.Rptr. 349].) The subject declaration by only one juror purports to impeach the mental processes of her fellow jurors by the unsupported conclusionary statements that "In truth, three-fourths of such jurors at that time were not in agreement as to a verdict in this action" and that "It is my honest opinion that this matter was not fully deliberated upon by the jury, and that the verdict as rendered was unfairly arrived at and coerced by the circumstances surrounding the reading of such verdict while in the courtroom; and after it had been mistakenly announced that the jury had arrived at a verdict." As already pointed out, the circumstances surrounding the return of the verdict are devoid of any coercion.

We perceive, moreover, that although the subject declaration was inadmissible it was nevertheless considered by the court and was obviously considered in the light of the facts known by the court as to what transpired

---

[6]The subject declaration was the subject of extended briefs filed with respect to the motion for new trial.

when the jury was polled. It should be here pointed out that the only attempt in the juror's declaration to show conduct influencing her to assent to the verdict was the circumstances surrounding the polling of the jury. Accordingly, the court was called upon to weigh the juror's alleged mental processes against her affirmative statement in court. Assuming, therefore, that the issue was one of abuse of discretion, no such abuse appears in the light of the rule that the plaintiff has the burden of showing, on a motion for new trial, that the court abused its discretion. (See *Develop-Amatic Engineering* v. *Republic Mortgage Co.,* 12 Cal.App.3d 143, 151 [91 Cal. Rptr. 193]; *Yarrow* v. *State of California,* 53 Cal.2d 427, 434-435 [2 Cal.Rptr. 137, 348 P.2d 687].) Finally, it should be noted that, even if the juror's declaration could conceivably be considered as sufficient to cast doubt upon her assent to the verdict, her own vote was not crucial to the verdict since there would still be nine votes in favor of the verdict, sufficient to constitute the three-fourths majority required for a verdict. In the absence of contrary evidence, it must be assumed that the votes of the other jurors, as disclosed by the polling of the jury reflect their verdict.

The judgment is affirmed.

Sims, J., and Elkington, J., concurred.