[No. B012677. Second Dist., Div. One. Apr. 29, 1986.]

FRANCES J. HECTOR, Plaintiff and Appellant, v.
CEDARS-SINAI MEDICAL CENTER, Defendant and Respondent.

494

496

## COUNSEL

Royce & Seaman, Royce & Inferrera, George R. Royce, John M. Inferrera and William J. Moon for Plaintiff and Appellant.

Veatch, Carlson, Grogan & Nelson, James C. Galloway, Jr., Michael E. Wasserman, Greines, Martin, Stein & Richland, Kent L. Richland and Regina Covitt for Defendant and Respondent.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Plaintiff Frances J. Hector appeals from an order dismissing her second and third causes of action against defendant following the granting of defendant's motion for partial summary judgment.

### STATEMENT OF FACTS

Plaintiff filed a complaint against Cedars-Sinai Medical Center (Cedars-Sinai) and American Technology, Inc., alleging personal injury resulting from the implantation of a defective pacemaker. The pacemaker was manufactured by American Technology, Inc., and implanted at Cedars-Sinai by plaintiff's physician, Dr. Eugene Kompaniez.

The complaint contained three causes of action: negligence, strict liability and breach of warranty. Cedars-Sinai moved for partial summary judgment on plaintiff's second and third causes of action, strict liability and breach of warranty, alleging as a matter of law there were no triable issues of fact. The trial court granted the motion. ██ Plaintiff subsequently requested and received dismissal of the first cause of action, negligence, against

Cedars-Sinai. The trial court then issued its order dismissing the second and third causes of action.[1]

## CONTENTION

Plaintiff contends the trial court erred in finding Cedars-Sinai was exempt from the application of the strict products liability doctrine. For the reasons set forth below, we disagree.

## DISCUSSION

■ A motion for summary judgment properly is granted where the "affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice . . . may be taken" in support of and in opposition to the motion "show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subds. (b), (c).) The moving party's papers will be strictly construed, accepting as fact only those portions not contradicted by opposing papers (*Harding* v. *Purtle* (1969) 275 Cal.App.2d 396, 399 [79 Cal.Rptr. 772]), while the opposing party's papers are liberally construed, all facts therein being accepted as true (*Orser* v. *George* (1967) 252 Cal.App.2d 660, 669 [60 Cal.Rptr. 708]). (*Kelleher* v. *Empresa Hondurena de Vapores, S. A.* (1976) 57 Cal.App.3d 52, 56 [129 Cal.Rptr. 32].) Every reasonable doubt will be resolved in favor of the complaint. (*Schaefer* v. *Manufacturers Bank* (1980) 104 Cal.App.3d 70, 78 [163 Cal.Rptr. 402]; *Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 626-627 [157 Cal.Rptr. 248].)

The trial court granted defendant's motion for partial summary judgment on the basis of *Silverhart* v. *Mount Zion Hospital* (1971) 20 Cal.App.3d 1022 [98 Cal.Rptr. 187]. In *Silverhart*, plaintiff was undergoing surgery at defendant hospital when a surgical needle broke; the needle remained permanently imbedded in plaintiff's body. The trial court refused to instruct the jury as to the theory of strict liability.

■ On appeal, the court first recalls the origin of the application of strict liability in California: *Greenman* v. *Yuba Power Products, Inc.* (1963)

---

[1]While a trial court's grant of partial summary judgment and dismissal of one or more causes of action generally is reviewable only on appeal from the final judgment rendered in the case, an exception to this rule is made where the case involves multiple parties and the court's disposition leaves no issue to be determined between the parties to the appeal. (*Etienne* v. *DKM Enterprises, Inc.* (1982) 136 Cal.App.3d 487, 489 [186 Cal.Rptr. 321]; see *Justus* v. *Atchison* (1977) 19 Cal.3d 564, 568 [139 Cal.Rptr. 97, 565 P.2d 122].) The effect of plaintiff's dismissal of the first cause of action as to Cedars-Sinai was that the trial court's order of dismissal determined all issues remaining between the parties. Therefore, the order is reviewable on appeal.

59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897] held that " '[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.' (At p. 62.)" (*Silverhart, supra,* at p. 1025.) The court then notes the expansion of the doctrine to impose strict liability on others in the chain of distribution, not merely manufacturers. (*Id.,* at p. 1026.) For example, *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168] extends strict liability to retailers since they are "engaged in the business of distributing goods to the public" and "are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products." (At p. 262.) This rule is stated in section 402A of the Restatement Second of Torts: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. . . ." (See *Silverhart, supra,* at p. 1028; see also *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 475 [85 Cal.Rptr. 629, 467 P.2d 229].)

▪ After surveying the cases which expand the scope of strict liability, the *Silverhart* court observes: "A significant common element running through the cases is that each of the defendants against whom the standard of strict liability has been applied played an integral and vital part in the overall production or marketing enterprise. At the very least the defendant in each case was a link in the chain of getting goods from the manufacturer to the ultimate user or consumer. . . . [¶] Plaintiff seeks to extend the doctrine of strict liability to a hospital that furnishes, in connection with the care and treatment of a patient, a product that proves to have a defect that causes injury to the patient. The theory upon which she seeks to predicate such liability is that the hospital is a 'supplier' of such product and, therefore, should be subject to the same standard of liability as any other supplier of articles or products." (20 Cal.App.3d at p. 1026, citations omitted.)

The court then examines two key cases in which strict liability has not been applied to the medical profession: "In *Magrine* v. *Krasnica* [(1967)] 94 N.J. Super. 228 [227 A.2d 539], affirmed 100 N.J. Super. 223 [241 A.2d 637], and 53 N.J. 259 [250 A.2d 129], the court declined to apply the doctrine of strict liability to a dentist whose drill, with a latent defect, broke while he was working on his patient, causing injury to the patient. The court stated, 'Of . . . meaningful significance is a recognition that the *essence* of the transaction between the retail seller and the consumer relates to the *article sold.* The seller is *in the business* of supplying the product to

the consumer. It is that, and that alone, for which he is paid. A dentist or a physician offers, and is paid for, his professional services and skill. That is the *essence* of the relationship between him and his patient.' (94 N.J. Super. at p. 235 [227 A.2d at p. 543].)

■ "The foregoing statement in *Magrine* was cited with approval in *Carmichael* v. *Reitz* [(1971)] 17 Cal.App.3d 958, 979 . . . . In *Carmichael* it was held that the doctrine of strict liability did not apply to a doctor who prescribed a drug which produced untoward results in a patient. In that case we find the following rationale: '[T]here is a difference in status or classification between those upon whom the courts have heretofore imposed the doctrine of strict liability and a physician who prescribes an ethical drug to achieve a cure of the disorders for which the patient has sought his professional services. The former act basically as mere conduits to the distribution of the product to the consumer; the latter sells or furnishes his services as a healer of illnesses. The physician's services depend upon his skill and judgment derived from his specialized training, knowledge, experience, and skill. The physician prescribes the medicine in the course of chemotherapy only as a chemical aid or instrument to achieve a cure. A doctor diagnosing and treating a patient normally is not selling either a product or insurance. One of the requisites which the Restatement prescribes for the imposition of strict liability is that "the seller is engaged in the business of selling such product." (Rest.2d Torts, § 402A.)' (See com. f.)" (*Silverhart* v. *Mount Zion Hospital, supra,* 20 Cal.App.3d at pp. 1026-1027, original italics.)

■ The *Silverhart* court was "persuaded that the rationale of *Magrine* and *Carmichael* applies with equal force to a hospital in the exercise of its primary function which is to provide medical services. A hospital is not ordinarily engaged in the business of selling any of the products or equipment it uses in providing such services. The essence of the relationship between a hospital and its patients does not relate essentially to any product or piece of equipment it uses but to the professional services it provides." (*Id.,* at p. 1027, fn. omitted.) The court notes, however, that "this principle does not apply where the hospital is engaged in activities not integrally related to its primary function of providing medical services, such as the situation where the hospital operates a gift shop which sells a defective product." (*Ibid.,* fn. 4.) The court concludes the rule of strict liability cannot be applied to defendant hospital. (*Id.,* at p. 1028.)

The key to the court's conclusion is the characterization of hospitals as providers of professional medical services, not suppliers of products. This characterization was reiterated by the Supreme Court in *Murphy* v. *E.R. Squibb & Sons, Inc.* (1985) 40 Cal.3d 672 [221 Cal.Rptr. 447, 710 P.2d 247], which addresses the question whether a pharmacy should be strictly

liable for defects in the drugs which it dispenses. ■ The court first notes the general rule; "'those who sell their services for the guidance of others . . . are not liable in the absence of negligence or intentional misconduct.'" (At p. 677, quoting from *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15].) *Murphy* cites *Silverhart*, *Magrine* and *Carmichael* as examples of the application of this general rule. It then contrasts the role of the pharmacist with that of the hospital, dentist or doctor: the pharmacist's services are rendered only in connection with the sale of drugs and the pharmacist is in the business of selling drugs, while the hospital, dentist and doctor *are not* in the business of selling drugs or devices; they use the products in the course of treatment, and furnishing services to the patient does not depend upon selling a product. (40 Cal.3d at p. 679.)[2]

■ Cases dealing with blood transfusions and products reflect the same considerations when declining to apply strict liability to hospitals, although there is additional statutory justification for treating these items as services rather than sales. *Shepard* v. *Alexian Brothers Hosp.* (1973) 33 Cal.App.3d 606 [109 Cal.Rptr. 132] states: "It needs no extended discussion to perceive that a hospital is primarily devoted to the care and healing of the sick. The supplying of blood by the hospital is entirely subordinate to its paramount function of furnishing trained personnel and specialized facilities in an endeavor to restore the patient's health. Providing medicine or supplying blood is simply a chemical aid or instrument utilized to accomplish the objective of cure or treatment. The patient who enters a hospital goes there not to buy medicine or pills, not to purchase bandages, iodine, serum or blood, but to obtain a course of treatment (*Perlmutter* v. *Beth David Hospital* [(1954) 308 N.Y. 100 (123 N.E.2d 792)] 795-796; *Silverhart* v. *Mount Zion Hospital*[, *supra*,] 20 Cal.App.3d 1022, 1027 . . .). It is also obvious that in the normal commercial transaction contemplated in the strict liability cases the essence of the transaction relates *solely* to the article sold, the seller is in the business of supplying the product to the consumer, and it is that, and that alone, for which he is paid (*Magrine* v. *Spector* (1968) 100 N.J. Super. 223 [241 A.2d 637]). The foregoing marked distinctions compel the conclusion that *a hospital* is not engaged in the business of distributing blood to the public and *does not put the blood as a product on the market in order to profit therefrom.*" (*Shepard, supra,* at p. 611, original italics.)

■ Turning to the facts in the instant case, Howard Allen, M.D., Director of the Cedars-Sinai Cardiac Noninvasive Laboratory states in his declaration that the specific model and type of pacemaker to be implanted in a patient is specified by the surgeon. The surgeon ordinarily contacts the

---

[2]However, the court ultimately holds, for other reasons, a pharmacy is not strictly liable for defects in the drugs it sells. (40 Cal.3d at p. 681.)

manufacturer's representative to provide for delivery of the pacemaker to the operating room when it is to be implanted. The pacemaker may be sterilized and ready for implantation when it is delivered to the hospital; the manufacturer's representative or the surgeon may pretest the pacemaker, but the hospital employees do not.

Dr. Allen indicated Cedars-Sinai does not routinely stock pacemakers, nor is it in the business of recommending, selling, distributing or testing pacemakers. The treatment provided by Cedars-Sinai in relation to implantation of pacemakers includes pre- and post-operative care, nursing care, a surgical operating room and technicians.

Melanie Archibald, Cedars-Sinai Finance Manager for Operating Room Services, stated in her declaration the pacemaker implanted in plaintiff was delivered to Dr. Kompaniez in the operating room on the day of surgery by Jack Albrighton. Dr. Kompaniez had ordered the pacemaker directly from American Technology, Inc.; Cedars-Sinai received the packing slip and invoice slip from the manufacturer. The hospital was billed $2,295 for the pacemaker and $250 for a bipolar endocardial lead; the hospital added a routine surcharge of 85 percent to the patient's bill for the implanted pacemaker.

Ms. Archibald also indicated Cedars-Sinai does not stock, recommend, distribute or sell any pacemakers. She characterized the hospital's role as facilitating the processing of the implantation by performing the management practice of completing a purchase requisition and completing a charge ticket which is forwarded to patient billing offices.

Cedars-Sinai Director of Finance, Edward Pruchunas, stated in his declaration that Cedars-Sinai is a nonprofit California corporation receiving the majority of its funding from payment for services rendered to its patients. Charges for services are billed to patients in two forms: room and ancillary. The room charge includes the room, meals and routine nursing services. Other items and services are considered ancillary and separate charges are made for their use.

Mr. Pruchunas explained the rates for the services are set so that the cumulative charges for the services will pay for all projected expenditures. The markup for individual services and supplies is set at different levels for different items. Rate increases are applied across-the-board on a department-by-department basis, not on an individual procedure basis, and rates historically are set once a year. Prior to adjusting the rates, a survey is done of room and major high volume services to determine general comparability

with rates at other facilities; modifications are proposed where individual charges appear to be incomparable.

The foregoing declarations indicate Cedars-Sinai is not "engaged in the business of distributing [pacemakers] to the public" (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d at p. 262) and does not play "an integral and vital part in the overall production or marketing" of pacemakers (*Silverhart* v. *Mount Zion Hospital, supra,* 20 Cal.App.3d at p. 1026; *Vandermark, supra,* at p. 262). The hospital does not order pacemakers for itself, but may fill out the purchase requisitions for surgeons who order the devices. The hospital does not stock or recommend pacemakers or provide them to the general public, dealing with pacemakers only in the context of the courses of treatment for particular patients. Even then, it is the surgeon who chooses or recommends the particular device to be implanted; the hospital merely provides administrative services in connection with the order and support services in connection with the implantation.

■ The essence of the relationship between hospital and patient is the provision of professional medical services necessary to effect the implantation of the pacemaker—the patient does not enter the hospital merely to purchase a pacemaker but to obtain a course of treatment which includes implantation of a pacemaker. (*Shepard* v. *Alexian Brothers Hosp., supra,* 33 Cal.App.3d at p. 611; *Silverhart* v. *Mount Zion Hospital, supra,* 20 Cal.App.3d at p. 1027.) As a provider of services rather than a seller of a product, the hospital is not subject to strict liability for a defective product provided to the patient during the course of his or her treatment. (*Murphy* v. *E.R. Squibb & Sons, Inc., supra,* 40 Cal.3d at p. 679; *Shepard, supra,* at p. 611; *Silverhart, supra,* at pp. 1027-1028; Rest.2d Torts, § 402A.)

■ Plaintiff argues Cedars-Sinai should not be exempt from the application of strict liability, in that its actions do not fall within any of the three previously recognized categories of exemption: blood and blood products, tools of the trade, and essential conduits. However, this argument presupposes Cedars-Sinai is in fact engaged in the business of selling pacemakers, thus otherwise subject to strict liability for selling a defective product; if the hospital is a provider of services, it is not subject to strict liability and it is unnecessary to find an exemption to protect it from the application of the doctrine.

Moreover, plaintiff's definition of the three exemptions misses the mark; the definitions are based on overly restrictive readings of the cases from which they are drawn. ■ Blood and blood products are exempt from strict liability for two reasons: First, the need for blood products and the

**505**

inability of medical science to guarantee their purity or safety, and second, the statutory definition of their provision as a *service*, not a sale. (*Shepard v. Alexian Brothers Hosp., supra,* 33 Cal.App.3d at p. 611; Health & Saf. Code, § 1606.) Moreover, as *Shepard* observes, the supplying of blood to a hospital patient is subordinate to the hospital's primary function of providing a course of treatment to the patient. (33 Cal.App.3d at p. 611.)

Plaintiff's "tools of the trade" exemption is based on *Silverhart*. Yet, the decision in *Silverhart* does not depend upon the characterization of the defective needle as a tool of the trade, but upon the definition of a hospital as a provider of services. The opinion merely mentions the hospital itself was a user of the defective needle, since the needle was part of the surgical equipment routinely used by surgeons in the course of the provision of medical services. (20 Cal.App.3d at pp. 1027-1028.) The opinion does not turn on the hospital's status as a user.

Plaintiff's third exemption is the "essential conduit or necessary intermediary" "for something like an ethical drug or similar product." However, once again, plaintiff's exemption applies to one who, in plaintiff's own words, "is essentially furnishing services as a healer of illnesses." As previously discussed, one who provides services rather than selling a product is not subject to strict liability.

Rather than focusing on the three "exemptions," the better approach is to view plaintiff's argument as: (1) Cedars-Sinai should be considered a seller of a product, rather than a provider of services, in that it did not rely on its skill and judgment in providing the pacemaker to plaintiff but was a mere conduit in the chain of distribution from manufacturer to consumer, or (2) even if Cedars-Sinai was providing services, they were not of the type which should be immune from the imposition of strict liability.

In attempting to characterize Cedars-Sinai as engaged in the business of selling a product rather than providing services, plaintiff places heavy emphasis on the 85 percent surcharge on the pacemaker. But the determinative question is not how much the hospital charges for what it does, but what the hospital does. According to the declarations of hospital personnel, the 85 percent surcharge is not designed to provide the hospital with a profit from the sale of the pacemaker but is part of an overall scheme to provide that the cost to patients of services and supplies covers the hospital's projected expenditures and is comparable to the cost for the same items at other facilities. The 85 percent surcharge in and of itself does not place the hospital in the business of selling pacemakers.

Another approach to holding the hospital to be a seller rather than a provider of services is to focus on the fact the hospital, in facilitating the implantation of the pacemaker by completing the purchase requisition and charge ticket and forwarding the latter to the patient billing offices, is acting as a mere conduit to the distribution of the product to the consumer and is not actually furnishing medical services. (See *Silverhart* v. *Mount Zion Hospital, supra,* 20 Cal.App.3d at pp. 1026-1027; *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 979 [95 Cal.Rptr. 381].) If the hospital "is engaged in activities not integrally related to its primary function of providing medical services," it is not immune from strict liability. (*Silverhart, supra,* at p. 1027, fn. 4.)

■■■ Unlike the products sold in a hospital gift shop, for which the hospital is strictly liable (*ibid.*), the pacemaker provided to the patient is necessary to the patient's medical treatment. While the hospital itself does not use its own medical skill or knowledge in providing its services in connection with the provision of the pacemaker for the patient, the hospital still is engaged in the process of providing everything necessary to furnish the patient with a course of treatment. In this regard, the hospital's actions concerning the provision of the pacemaker are "integrally related to its primary function of providing medical services." (*Ibid.*)

There also have been attempts made to distinguish between different types of services provided by a hospital. In *Johnson* v. *Sears, Roebuck & Co.* (E.D.Wis. 1973) 355 F.Supp. 1065, the court divided the services provided by hospitals into two types: professional medical services and mechanical and administrative services, which support the former. (At p. 1066.) The court concluded the latter should not necessarily be exempt from strict liability. (*Id.,* at p. 1067.) This distinction is not necessarily clear or easy to apply. (See *Hoven* v. *Kelble* (1977) 79 Wis.2d 444 [256 N.W.2d 379, 390, fn. 13].) The one case applying strict liability on the basis of *Johnson* is *Grubb* v. *Albert Einstein Medical Center* (1978) 255 Pa. Super. 381 [387 A.2d 480], in which the hospital supplied a defective tool to a surgeon who used the tool on plaintiff in surgery, injuring her. Yet, under California law, this constitutes the provision of medical services for which the hospital could not be held strictly liable. As discussed above, the hospital's conduct in the instant case falls within these parameters; hence, it cannot be held strictly liable.

Of equal importance, the policy considerations behind the imposition of strict product liability would not be served by its application here. ■■■ Strict liability is imposed "to insure that the cost of injuries resulting from defective products are borne by the manufacturers who put such products on the market rather than by the injured persons who are powerless to protect

themselves." (*Shepard* v. *Alexian Brothers Hosp.*, *supra*, 33 Cal.App.3d at p. 610, italics omitted; *Greenman* v. *Yuba Power Products, Inc.*, *supra*, 59 Cal.2d at p. 63; see also *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722].) Further, since the defendant profits from the sale of the products, it is in a good strategic position to protect itself by inquiring about or testing the products, promoting safety through pressure on the manufacturer, selling another product which is not defective, or insuring itself and distributing the risk of injury among the public as a cost of doing business. (*Shepard*, *supra*, at pp. 610-611; *Price*, *supra*, at p. 251; *Vandermark* v. *Ford Motor Co.*, *supra*, 61 Cal.2d at pp. 262-263.)

Plaintiff asserts the imposition of strict liability will result in lower costs for health care, since the hospital no longer will be able to charge high fees for processing the paperwork for pacemakers ordered by physicians for their patients. But because the overall charges to the patients must equal the overall expenditures by the hospital, any decrease in the charge on pacemakers necessarily would mean an increase in another charge, and there would be no overall decrease in the cost to the consumer of health care. Moreover, if a hospital is to be considered a seller who places a product on the market and who must bear the cost of injuries resulting from defective products, it will have to insure itself and distribute the risk of injury among the public as a cost of doing business. This necessarily will result in higher costs for health care.

In the instant case, the hospital does not select the pacemaker for the patient, but the selection is made by the treating physician. Thus, the hospital is in a poor position to protect itself by inquiring about or testing the devices, pressuring the manufacturer to promote product safety or selling a different pacemaker which is not defective. The imposition of strict liability would force the hospital to become involved in the selection process. This might provide added protection to the patient; it might also increase the cost of hospital services. But once the hospital began using its medical knowledge to aid in the selection of a pacemaker, it would be in the position of providing professional medical services, for which it could not be held strictly liable. Thus, there would be no ultimate advantage to putting the hospital in the position of having to take part in the selection process.

For the foregoing reasons, we conclude Cedars-Sinai is not "engaged in the business of selling" pacemakers, but is a provider of medical services which included the provision of the pacemaker implanted in plaintiff. Inasmuch as the hospital is not a seller, it cannot be held strictly liable

for injuries to plaintiff caused by defects in the pacemaker.[3] Accordingly, the trial court did not err in granting the motion for partial summary judgment.

The order is affirmed.

Lucas, J., and Devich, J., concurred.

On May 27, 1986, the opinion was modified to read as printed above.

---

[3]For the same reason, Cedars-Sinai cannot be held liable under a breach of warranty theory. (*Shepard* v. *Alexian Brothers Hosp.*, *supra*, 33 Cal.App.3d at pp. 614-615.)