668 A.2d 521

**Albert F. CAFAZZO, and Tammy J. Cafazzo, his wife, Appellants,**

**v.**

**CENTRAL MEDICAL HEALTH SERVICES, INC., a corporation, Central Medical Pavilion, Inc., a corporation, and Norman Stern, D.M.D., Appellees.**

Supreme Court of Pennsylvania.

Argued March 7, 1995.

Decided Nov. 28, 1995.

Robert W. Deer, Lorrie K. Albert, Law Offices of Robert W. Deer, Pittsburgh, James F. Mundy, Philadelphia, for Appellants.

Laurence M. Kelly, Kelly & Kelly, Montrose, for Pennsylvania Trial Lawyers.

David B. White, Stella L. Smetanka, Sherry L. Halfhill, Burns, White & Hickton, Pittsburgh, for Norman Stern.

Louis C. Long, Julie Fields Sweeney, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, for Central Medical Health Services, Inc. & Central Medical Pavillion, Inc.

Roland D. Morris, Mark B. Schoeller, Duane, Morris & Heckscher, Philadelphia, for Hospital Association of Pennsylvania.

Robert B. Hoffman, Reed, Smith, Shaw & McClay, Harrisburg, for Pennsylvania Medical Society.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## *OPINION*

MONTEMURO, Justice.

In this case of first impression, we are presented with the question of whether a hospital and a physician can be held subject to strict liability under the Restatement of Torts (Second) § 402A, for defects in a product incidental to the provision of medical services.

In 1986, appellant Albert Cafazzo underwent surgery for implantation of a mandibular prosthesis. In 1992, some time after it was discovered that this device was defective, a complaint [1] was filed against appellees, the physician who performed the surgery and the hospital where the operation took place, claiming that "all defendants sell, provide or use certain prosthetic devices," and that they should be held strictly liable as having "provided, sold or otherwise placed in the stream of commerce products manufactured by Vitek, Inc., known as Proplast TMJ Implants." The complaint alleged that the prosthesis was defectively designed, unsafe for its intended use, and lacked any warning necessary in order to ensure safety.

Appellees' preliminary objections in the nature of a demurer were granted by the trial court which concluded that appellant had failed to state a claim cognizable under Pennsylvania law, and the Superior Court affirmed. We granted allocatur to determine whether liability will attach under the circumstances of this case.

█ In reviewing a dismissal on the pleadings in the nature of a demurrer, the averments of the complaint must be taken as true *except* to the extent that they constitute conclusions of law. *Cianfrani v. Commonwealth, State Employees Retirement Board*, 505 Pa. 294, 479 A.2d 468 (1984). Thus we are not compelled to accept appellants' legal analysis, only their recitation of the facts. Whether appellees are sellers for the purposes of 402A is the central issue in this matter, and, therefore, appellants' assertion that appellees are in fact,

---

**1.** Appellant Tammy J. Cafazzo instituted an action for loss of consortium.

sellers, need not be accepted out of hand. Moreover, even if the central question is answered in the affirmative, the corollary issue arises as to whether appellees, by virtue of their position as providers of health care, are exempted from the consequences of having so acted.

This Court finds that the answer to the initial question is a negative, and further holds that even if appellees could be shown to have "marketed" the prothesis, strict liability does not apply.

■ Section 402A of the Restatement (Second) of Torts, provides in relevant part as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the consumer without substantial change in the condition in which it is sold.

While we do not slavishly adhere to the language of 402A, the rule enunciated there, as with other non-statutory declarations, is a common law pronouncement by the court, which "always retains the right and the duty to test the reason behind a common law rule in determining the applicability of such a rule to the facts before it." *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 212, 584 A.2d 1383, 1385 (1981). What appellants would have us do is to apply the rule while ignoring the facts of this case, after having accepted as a "fact" the central issue which must be resolved in order to determine whether application of the rule is proper. Such a procedure makes a mockery of the idea behind strict liability, i.e., that it inheres only in situations where a defective product has been provided by a seller "engaged in the business of selling such a product."

In *Musser v. Vilsmeier Auction Co., Inc.*, 522 Pa. 367, 562 A.2d 279 (1989), this Court observed that "the broadened

concept of "supplier," for purposes of predicating strict liability, is not without practical limits. The limits obtain in the purposes of the policy. When those purposes will not be served, persons whose implication in supplying products is tangential to that undertaking will not be subjected to strict liability for the harms caused by defects in those products." *Id.* at 372, 562 A.2d at 281. The policy behind strict liability is "to insure that the costs of injuries resulting from defective products are borne by the manufacturers who put such products on the market rather than by the injured persons who are powerless to help themselves." *Shepard v. Alexian Brothers Hospital,* 33 Cal.App.3d 606, 610, 109 Cal.Rptr. 132, 132 (1973) (emphasis omitted), and to further insure that defective products are removed from the market.

In this instance, the manufacturer is in bankruptcy, and unable to sustain liability. Thus, an alternative, and solvent, payor was sought. All other considerations were subordinated to this objective, hence the unequivocal necessity, in appellants' view, for appellees to be designated as sellers irrespective of the actual facts of this matter. However, to ignore the ancillary nature of the association of product with activity is to posit surgery, or indeed any medical service requiring the use of a physical object, as a marketing device for the incorporated object. This is tantamount to deciding that the surgical skills necessary for the implantation of, e.g., mandibular prostheses, are an adjunct to the sale of the implants. Moreover, under such a theory, no product of which a patient in any medical setting is the ultimate consumer, from CT scanners to cotton balls, could escape the assignment of strict liability. Clearly, the relationship of hospital and/or doctor to patients is not dictated by the distribution of such products, even if there is some surcharge on the price of the product. As the New York Court of Appeals has aptly stated,

> Concepts of purchase and sale cannot be separately attached to the healing materials ... supplied by the hospital for a price as part of the medical services. That the property or title to certain items of medical material may be transferred, so to speak, from the hospital to the patient

during the course of medical treatment does not serve to make such a transaction a sale. "Sale" and "transfer" are not synonymous, and not every transfer of personal property constitutes a sale.

*Perlmutter v. Beth David Hospital,* 308 N.Y. 100, 104, 123 N.E.2d 792, 794 (1954).

■ The thrust of the inquiry is thus not on whether a separate consideration is charged for the physical material used in the exercise of medical skill, but what service is performed to restore or maintain the patient's health. The determinative question becomes not what is being charged, but what is being done. *See Hoff v. Zimmer,* 746 F.Supp. 872 (W.D.Wis.1990) (strict liability not applied to hospital for failure of hip prosthesis); *Easterly v. HSP of Texas, Inc.,* 772 S.W.2d 211 (Tex.Ct.App.1989) (strict liability not applied to hospital which supplied epidural kit containing defective needle); *Hector v. Cedars–Sinai Medical Center,* 180 Cal.App.3d 493, 225 Cal.Rptr. 595 (1986) (strict liability not applied to hospital for defective pacemaker); *Silverhart v. Mount Zion Hospital,* 20 Cal.App.3d 1022, 98 Cal.Rptr. 187 (1971) (strict liability not applied to dentist whose drill broke during use on patient; *Magrine v. Krasnica,* 94 N.J.Super. 228, 227 A.2d 539 (1971), *aff'd* 100 N.J.Super. 223, 241 A.2d 637 and 53 N.J. 259, 250 A.2d 129 (strict liability not applied to dentist whose drill broke while in use on patient).

The cases cited above have been labelled by some the exponents of a "service exception" to 402A. However, the very term "service exception" is misleading, since it presupposes that the distinction drawn where medical personnel/hospitals are involved is an artificial one. The cases, however, make clear that provision of medical services is regarded as qualitatively different from the sale of products, and, rather than being an exception to 402A, is unaffected by it. *See Hector v. Cedars–Sinai Medical Center, Inc.,* 180 Cal.App.3d 493, 225 Cal.Rptr. 595 (1986). To quote the Superior Court's holding in *Podrat v. Codman–Shurtleff, Inc.,* 384 Pa.Super. 404, 558 A.2d 895 (1989), *alloc. dn'd.,* 524 Pa. 609, 569 A.2d 1368 (1989),

[appellees] could not be liable under a theory of strict liability because [they were] not in the business of selling th[e implant], its use was only incidental to [appellees'] primary function of providing medical services, and the medical services could not have been rendered without the use of this product.

*Id.* at 410, 558 A.2d at 898.

This distinction is made clearer by the fact that case law also supports the application of 402A where what has been provided is not medical service or products connected with diagnosis and treatment, but rather materials related to mechanical or administrative functions. *See Thomas v. St. Joseph Hospital,* 618 S.W.2d 791 (Tex.Civ.App.1981) (hospital held strictly liable where hospital gown ignited when lighted match fell on it); *Silverhart v. Mount Zion Hospital,* 20 Cal.App.3d 1022, 98 Cal.Rptr. 187 (1971) (hospital would be found liable where not engaged in activities integrally related to primary function of providing medical services, e.g., defective product sold in gift shop).

 In this connection, it must be noted that the "seller" need not be engaged solely in the business of selling products such as the defective one to be held strictly liable. An example supporting this proposition appears in comment f of the Restatement (Second) of Torts, § 402A and concerns the owner of a motion picture theater who offers edibles such as popcorn and candy for sale to movie patrons. The analogue to the instant case is valid in one respect only: both the candy and the TMJ implant are ancillary to the primary activity, viewing a film or undergoing surgery respectively. However, beyond that any comparison is specious. A movie audience is free to purchase or not any food items on offer, and regardless of which option is exercised the primary activity is unaffected. On the other hand, while the implant was incidental to the surgical procedure here, it was a necessary adjunct to the treatment administered, as were the scalpel used to make the incision, and any other material objects involved in performing the operation, all of which fulfill a particular role in provision of medical service, the primary activity. Once the illness

became evident, treatment of some kind became a matter of necessity to regain health.

> [W]hen one enters the hospital as a patient[,] he goes there, not to buy medicines or pills, not to purchase bandages or iodine or serum or blood, but to obtain a course of treatment in the hope of being cured of what ails him.

*Perlmutter v. Beth David Hospital,* 308 N.Y. 100, 106, 123 N.E.2d 792, 795 (1954).

We find, consistent with the decisions cited above which distinguish medical services from merchandising, that in the first instance, appellees are not sellers, providers, suppliers or distributors of products such as to activate 402A.

■ Then, even assuming that providers of medical services could reasonably be termed sellers, in examining the test relied upon by appellants to "prove" their major premise, the policy reasons for strict liability are not present.

The test was posited by this Court in *Francioni v. Gibsonia Truck Corp.,* 472 Pa. 362, 372 A.2d 736 (1977), to determine whether a particular supplier of products, whose status as a supplier is already determined, is to be held liable for damages caused by defects in the products supplied. It was first concluded that a lessor of hauling equipment could properly be considered a supplier after the application of a four part inquiry, which focusses initially on which members of the marketing chain are available for redress; then asks whether imposition of liability would serve as an incentive to safety; whether the supplier is in a better position than the consumer to prevent the circulation of defective products; and, finally, whether the supplier can distribute the cost of compensation for injuries by charging for it in his business. *Id.* at 368–369, 372 A.2d at 739.

Appellants, ignoring the precondition necessary for application of this analysis, that is, establishment of the appellees as sellers, would nevertheless apply it. Even were we to do so, appellees would not be found liable.

First, as to the availability of some entity for redress, medical personnel and hospitals are already subject to liability, albeit only where the quality or quantity of the services they provide may be called into question.[2] It is perfectly reasonable to assume, for example, that a physician or hospital possesses the necessary skill and expertise to select a product for use in medical treatment which is fit for its intended purpose. An error of choice might indeed be attributed to negligence or ignorance. However, no allegation has been made that the selection of the Vitek TMJ was made either carelessly or intentionally despite knowledge of its defects. To assign liability for no reason other than the ability to pay damages is inconsistent with our jurisprudence. *See Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 584 A.2d 1383 (1991). Where the liability is sought to be imposed on a party which is not a seller under 402A, such liability would indeed be assigned for no reason at all.

Next comes the matter of whether applying strict liability would provide an incentive to safety. As the Superior Court correctly pointed out, the safety of the product depends on the judgment of those connected to the research, development, manufacture, marketing and sale of the product. *Cafazzo v. Central Medical Health Services*, 430 Pa.Super. 480, 487, 635 A.2d 151, 154 (1993). Moreover, the safety testing and licensing for use of medical devices is a responsibility specifically undertaken by the federal government. Therefore, imposing liability for a poorly designed or manufactured product on the hospitals and doctors who use them on the assurances of the FDA[3] is highly unlikely to effect changes of this sort. Again,

2. The Dissent warns that recognizing the availability of medical providers for suit in negligence "will exclude from liability those defendants which may be amenable to causes of action other than strict liability." Such a globalization of the holding in this case misses its point entirely: the question here concerns only whether providers of medical services are sellers for purposes of 402A.

3. Appellants allege in their Brief that some time prior to 1990, warnings on the use of the TMJ implant were issued by the United States Government and Vitek. Prior to appellants' receipt of these warnings, there was apparently no indication of a problem with the implant. The Complaint in this matter was filed in August of 1992.

selection of the wrong product becomes a matter of professional negligence for which recovery is available.

As to the related matter of restricting circulation of defective products, appellees and those similarly situated have no control over distribution. In *Musser v. Vilsmeier Auction Co., Inc.*, 522 Pa. 367, 562 A.2d 279 (1989), this Court noted that the "[control] factor implies the existence of some ongoing relationship with the manufacturer from which some financial advantage inures to the benefit of the latter and which confers some degree of influence on the [putative seller.]" *Id.* at 374, 562 A.2d at 282.

The influence described is that of the putative seller, i.e., doctor/hospital, on the manufacturing process. *Id.* However, in finding the relationship between auctioneer and product too tenuous to justify assignment of liability, the *Musser* Court notes that the catalogue of items for sale listed more than ninety different tractors, for each of which the auctioneer would have to be held strictly liable were 402A applied in the auction context. The list is easily comparable to the many items employed in surgery, which includes but is not limited to surgical instruments, medical devices such as the implant, anesthesia machine and accoutrements, drugs, bandages and dressings, surgical apparel and operating suite furniture, such as the table on which the procedure is performed.

The implications of the ruling espoused by appellants extend far beyond responsibility for a defective TMJ, and thus bring into sharp relief the problems surrounding any notion that it is enumerated products which should be exempted from the application of 402A. The difficulties inherent in such a course are obvious; particularly in medicine, the changes in technology are such that even definitional problems may arise. As an example, for purposes of 402A, is gene therapy a drug, and thus exempt under comment k, or a device or something else altogether? Who is to determine such exemptions, and at what time intervals?

*See* Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.*, Medical Device Amendments of 1976

The fourth question posed is whether the supplier of the product can distribute the cost of compensating for injuries resulting from defects by spreading the charges therefor. The Superior Court, in addressing this element in conjunction with redress for potential plaintiffs, notes that the only considerations for extending strict liability, ability to pay plaintiffs and ability to charge others, would result in absolute rather than strict liability, *Coyle*, and further observed that relying on cost factors alone without a logical basis would confine the focus of the 402A principle to the search for a deep pocket. The net effect of this cost spreading would further endanger the already beleaguered health care system. As a practical matter costs would merely be absorbed by the insurers of physicians and hospitals, whose charges would reflect the increase in policy rates without corresponding improvement to any aspect of the health care system. Rather, research and innovation in medical equipment and treatment would be inhibited. The Supreme Court of Wisconsin in *Hoven v. Kelble*, 79 Wis.2d 444, 256 N.W.2d 379 (1977), has observed, albeit in a slightly different context, that on balance, the peculiar characteristics of medical services outweigh any of the reasons which might exist to assign strict liability in the medical setting. These include the tendency to be experimental, which would certainly be adversely affected if 402A were applicable; a dependence on factors beyond the control of the professional; and a lack of certainty or assurance of the desired result. *Id.* at 467–472, 256 N.W.2d at 390–93. In short, medical services are distinguished by factors which make them significantly different in kind from the retail marketing enterprise at which 402A is directed.

Finally,

[B]efore a change in the law is made, a court, if it is to act responsibly must be able to see with reasonable clarity the results of its decision and to say with reasonable certainty that the change will serve the best interests of society.

*Id.* at 471, 256 N.W.2d at 391.

The consequences of a step such as appellant would have us take are of such magnitude, and of such potentially negative

effect as to require more examination than has yet been afforded this issue. It is, for example, not clear enough that strict liability has afforded the hoped for panacea in the conventional products area that it should be extended so cavalierly in cases such as the present one.

For these reasons, the order of the Superior Court is affirmed.

CAPPY, J., files a dissenting opinion.

MONTEMURO, J., participates by designation as a senior judge as provided by Rule of Judicial Administration 701(f).

CAPPY, J., dissenting:

I am deeply troubled by the majority's opinion and therefore must respectfully dissent.

My first point of concern is with the primacy given by the majority to the law of our sister states. The majority's reason for subordinating our case law to that of other jurisdictions is unclear. Relying on the decisions of other state courts is a wise course of action where we are taking an initial venture into an area of law; yet, that is not the case here. In this Commonwealth, we are fortunate to have an extensive and well-established body of law defining which defendants may be considered "sellers/suppliers" within § 402A of the Restatement (Second) of Torts. *See, e.g., Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977);[1] *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 584 A.2d 1383 (1991). My objection to relying on the law of our sister states is not

---

**1.** The *Francioni* test requires the Court first to examine whether holding a particular entity strictly liable makes a member of the marketing chain available to the injured party for redress. Second, we look to whether applying strict liability would provide an incentive to safety. Third, we ascertain whether the defendant is in a better position than the consumer to prevent the circulation of defective products. Finally, we inquire as to whether the defendant can distribute the cost of compensating for injuries resulting from the defective product by charging for it in his business. *Francioni*, 472 Pa. at 368–369, 372 A.2d at 739; *see also Coyle*, 526 Pa. at 216–217, 584 A.2d at 1387. After applying these four factors to the defendant at bar, the Court then is able to determine whether the defendant is a "seller/supplier" as a matter of law.

merely an academic one. In failing to take cognizance of the independent genesis of our case law, the majority has blithely ignored that our law is not necessarily compatible with that of our sister states.[2]

In addition to the unexplained deference to the law of foreign jurisdictions, the majority has also distorted our established case law. In analyzing the *Francioni* test, the majority has presented a muddled view of the test's purpose and an imperfect application of the test's prongs.

First, the majority has presented conflicting views on the purpose of the *Francioni* test. The majority initially states that the *Francioni* test is applicable only *after* the defendant's status as a "seller/supplier" has been determined. Maj. op. at p. 533–534. ("The test was posited by this Court in *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977), to determine whether a particular supplier of products, *whose status as supplier is already determined,* is to be held liable for damages." Maj. op. at p. 534 (emphasis supplied).) Yet, immediately following that statement, the majority acknowledges that the *Francioni* test is *the* method for determining who is a "seller/supplier." (The *Francioni* Court concluded that "a lessor of hauling equipment could properly be considered a supplier *after* the application of a four part inquiry...." Maj. op. at p. 534 (emphasis supplied).) I am worried that these contradictory statements could lead to confusion about the proper role for *Francioni.*

In addition to the arguably conflicting views on the purpose of the *Francioni* test, the majority's application of that test is far from faithful. The first example of the majority's misapplication of *Francioni* is with its analysis of the first prong of that test. The first prong of *Francioni* requires this Court to examine whether the defendant is in the marketing chain of

**2.** Furthermore, the exaltation of the law of our sister states cannot be supported by the bare assertion that the test enunciated in *Francioni, supra,* does not speak to the peculiar considerations attendant to the medical industry. We had no difficulties employing the *Francioni* test to determine that a pharmacist could not be held strictly liable as a "seller/supplier" of an allegedly defective prescription drug. *See Coyle, supra.*

the product. *Francioni*, 472 Pa. at 362, 372 A.2d at 739. The majority, ostensibly applying this test, concludes that the defendants are not amenable to strict liability because "medical personnel and hospitals are already subject to liability, albeit only where the quality or quantity of the services they provide may be called into question." Maj. op. at p. 535. This answer is a non-sequitur; the majority has sidestepped, rather than answered, the pertinent query of whether doctors and hospitals are in the marketing chain of this prosthesis. Furthermore, the majority's new version of the first *Francioni* prong is no improvement on the old test. This new test will not advance our analysis as to whether a certain defendant is amenable to strict liability, but instead will thwart it. The majority's test will exclude from strict liability those defendants which may be amenable to causes of action other than strict liability; it seems not to matter to the majority whether the plaintiff in the case before the court actually has that "other" cause of action available to it. I find this "test" perplexing for I can think of no entity which would not be excluded under the test fashioned by the majority. Thus, what purpose would this new "test" serve other than to eradicate strict liability?

Second, the majority also distorts the *Francioni* prong which directs the Court to ascertain whether this defendant is in a better position than the consumer to prevent the circulation of defective products. The majority commences its analysis of this point by recognizing that the focus of this inquiry is on whether there is "some ongoing relationship with the manufacturer from which some financial advantage inures to the benefit of the latter and which confers some degree of influence on the [putative seller]." *Musser v. Vilsmeier Auction Company*, 522 Pa. 367, 374, 562 A.2d 279, 282 (1989). The majority, however, rapidly loses sight of its objective. It deduces that since the defendants here have an extensive list of products at their disposal, as did the defendant in *Musser*, then the defendants here should also be held immune from strict liability as was the defendant in *Musser*. This distortion of *Musser* could have frighteningly far-reaching implications.

Such reasoning would lead to the absurd result that a department store, with an inventory of tens of thousands of items, would be less likely to be held strictly liable than the local, family-run convenience store with its modest inventory. Such a "test" does not advance the goals of strict liability, but rather perverts them.

I am gravely concerned that the majority's opinion will have an unwanted and adverse impact on our strict liability law. In an effort to reach its result in the area of medical services, the majority has failed to advance with caution. I agree with the majority that this area deserves "more examination than has yet been afforded this issue." Maj. op. at 538. Unfortunately, such an examination has not been presented and I am, therefore, compelled to dissent.