**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1041
_____


HEATHER R. OBERDORF;
MICHAEL A. OBERDORF, her husband,

                                       Appellants


v.


AMAZON.COM INC., a Washington Corporation


On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 4-16-cv-01127)
District Judge:  Honorable Matthew W. Brann


Argued October 3, 2018

Before:  SHWARTZ, SCIRICA and ROTH, <u>Circuit Judges</u>

(Opinion filed: July 3, 2019)

David F. Wilk (**Argued**)
Lepley, Engelman & Yaw
140 East Third St.
Williamsport, PA 17701

Counsel for Appellants

Eric D. Miller[*] (**Argued**)
William B. Murphy
Laura Hill
Perkins Coie
1201 Third Avenue
Suite 4900
Seattle, WA 98101

Timothy J. McMahon
Marshall, Dennehey, Warner, Coleman & Goggin
100 Corporate Center Drive
Suite 201
Camp Hill, PA 17011

Counsel for Appellee

―――――――――

OPINION OF THE COURT

―――――――――

―――――――――

[*] Mr. Miller withdrew his appearance on February 28, 2019.

ROTH, Circuit Judge:

On January 12, 2015, Heather Oberdorf returned home from work, put a retractable leash on her dog, and took the dog for a walk. Unexpectedly, the dog lunged, causing the D-ring on the collar to break and the leash to recoil back and hit Oberdorf's face and eyeglasses. As a result, Oberdorf is permanently blind in her left eye.

Oberdorf bought the collar on Amazon.com. As a result of the accident, she sued Amazon.com, including claims for strict products liability and negligence. The District Court found that, under Pennsylvania law, Amazon was not liable for Oberdorf's injuries. In its opinion, the District Court emphasized that a third-party vendor—rather than Amazon itself—listed the collar on Amazon's online marketplace and shipped the collar directly to Oberdorf. Those facts were the basis for the District Court's two main rulings.

First, the District Court found that Amazon is not subject to strict products liability claims because Amazon is not a "seller" under Pennsylvania law. Second, the District Court found that Oberdorf's claims are barred by the Communications Decency Act (CDA) because she seeks to hold Amazon liable for its role as the online publisher of third-party content.

I

Both issues in this case pertain to Amazon's role in effectuating the sale of products offered by third-party vendors. Therefore, we begin by describing the anatomy of a

sale on Amazon.com.[1]

<u>Amazon Marketplace</u>

Amazon is the world's most valuable retail company.[2] Its website is an online marketplace where Amazon retails its own products as well as those of more than one million third-party vendors.[3] These third-party vendors decide which products to sell, the means of shipping, and product pricing. For its part, Amazon lists the products on the Amazon Marketplace, collects order information from consumers, and processes payments. In exchange for these services, Amazon collects fees from each third-party vendor.

In order to use Amazon's services, a third-party vendor must assent to Amazon's Services Business Solutions Agreement. This Agreement governs every step of the sales process.

Once a third-party vendor has assented to the Agreement, the vendor chooses which product or products it

---

[1] Throughout this opinion, we use the more complete company name, "Amazon.com," to refer to Amazon's website, but use the shorter name, "Amazon" to refer to the company itself.

[2] David Streitfeld, *Amazon Is Now Second to Cross $1 Trillion Line*, N.Y. TIMES, Sept. 5, 2018, at B1.

[3] To remain consistent throughout this opinion, and to avoid using the term "seller," which has legal significance under Pennsylvania strict products liability law, we refer to the third parties who offer products on Amazon.com as "third-party vendors" or "vendors."

would like to sell using Amazon's website. This choice is, with some notable exceptions, left to the discretion of the vendor. Among the exceptions are products that Amazon determines are illegal, sexually explicit, defamatory, or obscene.

When the third-party vendor has chosen a product that it wants to offer on Amazon's website, the vendor provides Amazon with a description of the product, including its brand, model, dimensions, and weight. Pursuant to the Agreement, the vendor must also provide Amazon with digital images of the product, as well as other information such as shipping and handling options, product availability, in-stock status, and any other information reasonably requested by Amazon.

Based on this information, Amazon formats the product's listing on its website. This function, too, is provided for in the Agreement, by which Amazon retains the right in its sole discretion to determine the content, appearance, design, functionality, and all other aspects of the Services, including by redesigning, modifying, removing, or restricting access to any of them. In fact, the Agreement grants Amazon a royalty-free, non-exclusive, worldwide, perpetual, irrevocable right and license to commercially or non-commercially exploit in any manner, the information provided by third-party vendors.

The third-party vendor can then choose which, if any, of Amazon's other services it will use in conjunction with listing its product on Amazon's website. For example, Amazon offers "Amazon Clicks," an advertising service in which Amazon highlights and promotes the vendor's product to customers. Amazon also offers a "Fulfillment by Amazon"

service, in which it takes physical possession of third-party vendors' products and ships those products to consumers. Otherwise, the vendor itself is responsible for shipping products directly to consumers.

The listed price for the product is chosen by the third-party vendor, subject to one exception: Vendors may not charge more on Amazon than they charge in other sales channels. Nor, according to the Agreement, may third-party vendors offer inferior customer service or provide lower quality information about products than in other sales channels. To the extent that third-party vendors need to communicate with customers regarding their orders on Amazon, they must do so through the Amazon platform.

With these preliminaries completed, Amazon lists the product online and sales begin. As customers make purchases on Amazon's website, Amazon collects payment and delivers order information to the third-party vendor. At checkout, the customer can choose any shipping method offered by the third-party vendor, and any promises made by the vendor with respect to shipping date must be met. Amazon ensures compliance with this obligation by requiring the vendor to send Amazon shipping information for each order. In addition, vendors have a powerful interest in providing quality products and ensuring timely delivery, as Amazon allows shoppers to publicly rate the vendors and their products.

In exchange for its role in the transaction, Amazon collects two types of fees: one is a commission, typically between seven and fifteen percent of the overall sales price; the other is either a per-item or monthly fee, depending on the

third-party vendor's preference. At least once every two weeks, Amazon remits all sales proceeds, minus fees, to the vendor. Pursuant to the Agreement, Amazon is classified as the third-party vendor's "agent for purposes of processing payments, refunds, and adjustments . . . receiving and holding Sales Proceeds on your behalf, remitting Sales Proceeds to Your Bank Account, charging your Credit Card, and paying Amazon and its Affiliates amounts you owe . . .."[4]

Throughout each step of the sales process, Amazon may at any time cease providing any or all of the Services at its sole discretion and without notice, including suspending, prohibiting, or removing any listing. Amazon also retains other important privileges. For example, Amazon can require vendors to stop or cancel orders of any product. If Amazon determines that a vendor's actions or performance may result in risks to Amazon or third parties, it may in its sole discretion withhold any payments to the vendor. Furthermore, Amazon requires that its vendors release it and agree to indemnify, defend, and hold it harmless against any claim, loss, damage, settlement, cost, expense, or other liability.

The Dog Collar

On December 2, 2014, Heather Oberdorf logged onto Amazon's website. She typed search information for dog collars into Amazon's search terms box. She decided to purchase the dog collar at issue, which was sold by a third-party vendor, "The Furry Gang." The Furry Gang shipped the dog collar directly from Nevada to Oberdorf, who put the

---

[4] JA195.

collar on her dog, Sadie. Then, on January 12, 2015, while Oberdorf was walking Sadie, the D-ring on the collar broke and the retractable leash recoiled into Oberdorf's eyeglasses, injuring her and permanently blinding her in her left eye.

Neither Amazon nor Oberderf has been able to locate a representative of The Furry Gang, which has not had an active account on Amazon.com since May 2016.

Procedural History

Oberdorf filed a complaint in the United States District Court for the Middle District of Pennsylvania, bringing claims for strict product liability, negligence, breach of warranty, misrepresentation, and loss of consortium.[5] Oberdorf propounds two separate theories of strict product liability: (1) failure to provide adequate warnings regarding the use of the dog collar, and (2) defective design of the dog collar. She also asserts a variety of negligence theories, namely that Amazon was negligent in (1) distributing, inspecting, marketing, selling, and testing of the dog collar in an unreasonable manner; (2) allowing the dog collar to enter the stream of commerce in a dangerous condition; (3) failing to conduct a proper hazard analysis; (4) failing to follow the guidelines of the "safety hierarchy"; and (5) failing to provide the product with features, elements, precautions, or warnings that would have made it safer.

The District Court granted Amazon's motion for

---

[5] The breach of warranty and misrepresentation claims and Michael Oberdorf's loss of consortium claim are not relevant to the present appeal.

8

summary judgment, finding that (1) Amazon cannot be sued under Pennsylvania's strict products liability law because it does not constitute a "seller" within the meaning of Pennsylvania strict liability law, and (2) Oberdorf's claims are barred by the CDA because she seeks to hold Amazon liable for its role as the online publisher of a third party's content.

## II

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291. Because our review of a district court's grant of summary judgment is plenary, we affirm only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] In determining whether summary judgment is appropriate, we view all facts and make all reasonable inferences in favor of the non-moving party, in this case, the Oberdorfs.[7]

---

[6] Fed. R. Civ. P. 56(a); *see Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 266–67 (3d Cir. 2005).

## III

We begin our analysis by addressing Amazon's contention that it is not subject to Oberdorf's strict products liability claims.

Because our subject matter jurisdiction stems from the parties' diverse citizenship, we apply Pennsylvania law in deciding whether the District Court properly dismissed Oberdorf's strict products liability claim.[8] The Pennsylvania Supreme Court has made clear that the Second Restatement of Torts § 402A applies to Pennsylvania strict products liability claims.[9] Section 402A specifically limits strict products liability to "sellers" of products.[10] Amazon relies on this limitation as its defense, claiming that it is not a "seller" because it merely provides an online marketplace for products sold by third-party vendors. We disagree.[11]

---

[8] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

[9] *Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966).

[10] Restatement (Second) of Torts § 402A (Am. Law. Inst. 1965) (an actor can only be subject to strict liability for selling a defective product if he is a "seller . . . engaged in the business of selling such a product").

[11] Our decision, guided by Pennsylvania law, is limited to the question of whether Amazon is a "seller" based on its role in effectuating sales of physical products offered by third-party vendors. We express no view, for example, on whether other companies providing online marketplaces are considered "sellers."

A

Amazon relies heavily on the Pennsylvania Supreme Court's decision in *Musser v. Vilsmeier Auction Co, Inc.*[12] to support its contention that it is not a "seller." Although *Musser* is a significant case to which we look for guidance, it does not command the result that Amazon seeks.

The plaintiff in *Musser* was injured by a tractor that his father had bought at an auction house. Following his injury, he sought to hold the auction house strictly liable as a "seller" of the allegedly defective tractor. The Pennsylvania Supreme Court held that the auction house could not be considered a "seller," and thus that the plaintiff must prove that the auction house acted unreasonably (i.e., bring a negligence claim) in order to hold it liable.[13] In making this ruling, the court relied on the policy rationale articulated in comment f of § 402A of the Second Restatement of Torts:

> The basis of the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This

---

[12] 562 A.2d 279 (Pa. 1989).
[13] *Id.* at 282-83.

basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person or even to his buyer in the absence of his negligence.[14]

The court noted that, when the above policy rationale "will not be served, persons whose implication in supplying products is tangential to that undertaking will not be subjected to strict liability for the harms caused by defects in the products."[15]  Therefore, because "[t]he auction company merely provided a market as the agent of the seller," the court concluded that applying strict liability doctrine to the auction house would not further the doctrine's underlying policy justification.[16]

In its opinion, the Pennsylvania Supreme Court made clear that courts later tasked with determining whether an actor is a "seller" should consider whether the following four factors apply:

(1) Whether the actor is the "only member of the marketing chain available to the injured plaintiff for redress";
(2) Whether "imposition of strict liability upon the [actor] serves as an incentive to safety";

---

[14] *Id.* at 281 (quoting Restatement (Second) of Torts § 402A cmt. f).
[15] *Id.*
[16] *Id.* at 282.

(3) Whether the actor is "in a better position than the consumer to prevent the circulation of defective products"; and

(4) Whether "[t]he [actor] can distribute the cost of compensating for injuries resulting from defects by charging for it in his business, i.e., by adjustment of the rental terms."[17]

We consider below each of the four factors articulated in *Musser*.

1

The first factor is whether Amazon "may be the only member of the marketing chain available to the injured plaintiff for redress."[18] In *Musser*, the court found that this factor failed to support a finding that the auction house was a "seller" because in an auction there is a vendor, for whom the auctioneer is the agent and who may be amenable to suit under § 402A for negligence or breach of warranty.[19] In other words, the plaintiff in *Musser* could sue the other parties in the sales distribution chain.

---

[17] *Id.* (citations omitted). Note that the four-factor test articulated in *Musser* was applied earlier in the context of determining whether a lessor should be considered a "seller" for purposes of § 402A. *See Nath v. Nat'l Equip. Leasing Corp.*, 439 A.2d 633, 635-36 (Pa. 1981); *Francioni v. Gibsonia Truck Corp.*, 372 A.2d 736, 739 (Pa. 1977). However, *Musser* represents the court's first use of the test outside of that context.

[18] *Musser*, 562 A.2d at 282.

[19] *Id.*

Amazon contends that, just as every item offered at an auction house can be traced to a seller who may be amenable to suit, every item on Amazon's website can be traced to a third-party vendor. However, Amazon fails to account for the fact that under the Agreement, third-party vendors can communicate with the customer only through Amazon. This enables third-party vendors to conceal themselves from the customer, leaving customers injured by defective products with no direct recourse to the third-party vendor. There are numerous cases in which neither Amazon nor the party injured by a defective product, sold by Amazon.com, were able to locate the product's third-party vendor or manufacturer.[20]

In this case, Amazon's Vice President of Marketing Business admitted that Amazon generally takes no precautions to ensure that third-party vendors are in good standing under the laws of the country in which their business is registered. In addition, Amazon had no vetting process in place to ensure, for example, that third-party vendors were amenable to legal process. After Oberdorf was injured by the

---

[20] *See, e.g.*, *Allstate N.J. Ins. Co. v. Amazon.com, Inc.*, 17-cv-2738, 2018 WL 3546197, at \*2 (D.N.J. July 24, 2018) ("Neither Plaintiff nor [Amazon] is aware who manufactured the laptop battery . . .."); *Fox v. Amazon.com*, 16-cv-3013, 2018 WL 2431628, at \*6 (M.D. Tenn. May 30, 2018) ("[T]he manufacturer of the hoverboard at issue is unknown.") *appeal filed* No. 18-5661, 2018 WL 2431628 (6th Cir. June 25, 2018); *Stiner v. Amazon*, 15-cv-185837, 2017 WL 9751163, at \*7 (Ohio. Com. Pl. Sept. 20, 2017) (Dkt. No. 120-1) ("[The manufacturer] is a Chinese company and not subject to process and [the third-party vendor] is insolvent.").

14

defective leash, neither she nor Amazon was able to locate The Furry Gang. As a result, Amazon now stands as the only member of the marketing chain available to the injured plaintiff for redress.

The first factor weighs in favor of imposing strict liability on Amazon.[21]

2

The second factor we consider is whether "imposition of strict liability upon the [actor would] serve[] as an incentive to safety."[22] In *Musser*, the Pennsylvania Supreme Court "fail[ed] to see how the imposition of strict liability [on the auction house] would be more than a futile gesture in promoting the manufacture and distribution of safer products," chiefly because the auction house was "not in the business of designing and/or manufacturing any particular

---

[21] The dissent concludes that the first factor weighs in favor of Amazon because "[t]o assign liability for no reason other than the ability to pay damages is inconsistent with our jurisprudence." *Cafazzo*, 668 A.2d at 526. This contention overlooks the extensive record evidence that Amazon fails to vet third-party vendors for amenability to legal process. The first factor weighs in favor of strict liability not because The Furry Gang cannot be located and/or may be insolvent, but rather because Amazon enables third-party vendors such as The Furry Gang to structure and/or conceal themselves from liability altogether. As a result, Amazon remains "the only member of the marketing chain available to the injured plaintiff for redress." *Musser*, 562 A.2d at 281.
[22] *Musser*, 562 A.2d at 282.

15

product or products."[23]  Amazon asserts that it does not have a relationship with the designers or manufacturers of products offered by third-party vendors.  Therefore, it contends that imposing strict liability would not be an incentive for safer products.  Again, we disagree with Amazon.

Although Amazon does not have direct influence over the design and manufacture of third-party products, Amazon exerts substantial control over third-party vendors.  Third-party vendors have signed on to Amazon's Agreement, which grants Amazon "the right in [its] sole discretion to . . . suspend[], prohibit[], or remov[e] any [product] listing,"[24] "withhold any payments" to third-party vendors,[25] "impose transaction limits,"[26] and "terminate or suspend . . . any Service [to a third-party-vendor] for any reason at any time."[27]  Therefore, Amazon is fully capable, in its sole discretion, of removing unsafe products from its website.  Imposing strict liability upon Amazon would be an incentive to do so.

The second factor favors imposing strict liability on Amazon.[28]

---

[23] *Id.*

[24] JA168.

[25] JA150.

[26] *Id.*

[27] *Id.*

[28] The dissent contends that holding Amazon strictly liable for defective products will require them to "enter a fundamentally new business model" because "the company does not undertake to curate its selection of products, nor generally to police them for dangerousness."  Dissent at 21-

The third factor we consider is whether Amazon is "in a better position than the consumer to prevent the circulation of defective products."[29]

In *Musser*, the court indicated that the auctioneer was not in a better position than the consumer to prevent the circulation of defective products because it lacked an "ongoing relationship with the manufacturer from which some financial advantage inures to [its] benefit . . .."[30] Similarly, in *Nath v. National Equipment Leasing Corp.*,[31] the Pennsylvania Supreme Court held that, because financing agencies perform only a "tangential" role in the sales process, "their relationship with a particular manufacturer does not, in the normal course, possess the continuity of transactions that would provide a basis for indirect influence over the condition and the safety of the product."[32] Here, while Amazon may at times lack continuous relationships with a third-party vendor, the potential for continuing sales encourages an on-going relationship between Amazon and the third-party vendors.

---

22. We do not believe that Pennsylvania law shields a company from strict liability simply because it adheres to a business model that fails to prioritize consumer safety. The dissent's reasoning would give an incentive to companies to design business models, like that of Amazon, that do nothing to protect consumers from defective products.

[29] *Musser*, 562 A.2d at 282.

[30] *Id.*

[31] 439 A.2d 633 (Pa. 1981).

[32] *Id.* at 636.

Moreover, Amazon is uniquely positioned to receive reports of defective products, which in turn can lead to such products being removed from circulation. Amazon's website, which Amazon in its sole discretion has the right to manage, serves as the public-facing forum for products listed by third-party vendors. In its contract with third-party vendors, Amazon already retains the ability to collect customer feedback: "We may use mechanisms that rate, or allow shoppers to rate, Your Products and your performance as a seller and Amazon may make these ratings and feedback publicly available."[33] Third-party vendors, on the other hand, are ill-equipped to fulfill this function, because Amazon specifically curtails the channels that third-party vendors may use to communicate with customers: "[Y]ou may only use tools and methods that we designate to communicate with Amazon site users regarding Your Transactions . . .."[34]

The third factor also weighs in favor of imposing strict liability on Amazon.[35]

---

[33] JA163.

[34] JA154.

[35] *Musser*, 562 A.2d at 282. The dissent contends that Amazon is no better-positioned than the consumer to encourage the safety of products sold in the Amazon Marketplace. However, the dissent openly acknowledges at least one aspect of Amazon's relationship with third-party sellers that demonstrates Amazon's powerful position relative to the consumer: Amazon "reserves the right to eject sellers." Dissent at 21. Imposing strict liability on Amazon will ensure that the company uses this relative position of power to eject sellers who have been determined to be selling defective goods.

The fourth factor we consider is whether Amazon can distribute the cost of compensating for injuries resulting from defects.

In *Musser*, the court "acknowledge[d] that it would be possible for the auctioneer to pass on the costs of imposing strict liability upon him; possibly as [the injured plaintiff] suggests, by indemnity agreements between the auctioneer and the seller."[36] However, although the court found that extending the meaning of "seller" to include the auctioneer would provide another remedy for injured customers, the court demurred, stating that this would "only marginally" promote the "purpose of the policy considerations" underlying § 402A.[37]

In this case, however, Amazon has already provided for indemnification by virtue of a provision in the Agreement:

> You release us and agree to indemnify, defend, and hold harmless us, our Affiliates, and our and their respective officers, directors, employees, representatives, and agents against any claim, loss, damage, settlement, cost, expense, or other liability (including, without

---

[36] *Musser*, 562 A.2d at 283.

[37] *Id.*

limitation, attorneys' fees) . . ..[38]

Moreover, Amazon can adjust the commission-based fees that it charges to third-party vendors based on the risk that the third-party vendor presents.

Amazon's customers are particularly vulnerable in situations like the present case. Neither the Oberdorfs nor Amazon has been able to locate the third-party vendor, The Furry Gang. Conversely, had there been an incentive for Amazon to keep track of its third-party vendors, it might have done so.

The fourth factor also weighs in favor of imposing strict liability on Amazon. Thus, although the four-factor test yielded a different result when applied by the *Musser* court to an auction house, all four factors in this case weigh in favor of imposing strict liability on Amazon.[39]

---

[38] JA267.

[39] The dissent contends that the Pennsylvania Supreme Court's decision in *Cafazzo* upended the Commonwealth's well-established four-factor analysis, thereby rendering the *Francioni* factors secondary to a threshold question of whether a particular defendant is a supplier/seller of the product. *Cafazzo v. Cent. Med. Health. Servs., Inc.*, 668 A.2d 521, 525 (Pa. 1995). However, even if we were to assume that *Cafazzo* created a threshold issue of whether Amazon is a seller, we believe, as detailed below, that under Pennsylvania law, Amazon is in fact a seller, and thus we must proceed to the *Francioni* factors.

20

B

We do not rely exclusively upon the four-factor test to reach our conclusion that Amazon is subject to strict products liability claims for sales involving third-party vendors. Our reasoning is consistent with that in other Pennsylvania cases.

Notably, in *Hoffman v. Loos & Dilworth, Inc.*,[40] the Pennsylvania Superior Court decided that a sales agent was a "seller" under § 402A, and thus subject to strict product liability under Pennsylvania law.[41] Although *Hoffman* predates *Musser*, its holding remains valid, as neither *Musser* nor any subsequent decision by the Pennsylvania Supreme Court has called *Hoffman*'s holding into question.[42] Moreover, *Hoffman* addresses Amazon's main argument: Amazon claims that it cannot be considered a "seller" because it does not take title to or possession of the products sold by third-party vendors. The court held in *Hoffman* that under Pennsylvania law a participant in the sales process can be held strictly liable for injuries resulting from defective products, even if the participant does not take title or possession of those products.[43]

---

[40] 452 A.2d 1349 (Pa. Super. 1982).

[41] *Id.* at 1354-55.

[42] *See Wisniewski v. Johns–Manville Corp.,* 759 F.2d 271, 273–74 (3d Cir. 1985). ("Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest state court would rule otherwise.").

[43] 452 A.2d at 1354-55.

*Hoffman* involved bulk sales of linseed oil. The manufacturer's sales agent, E.W. Kaufmann Co., would transmit orders for linseed oil from the packager to the distributor. That was Kaufmann's only role in the sales process. As part of the summary judgment briefing in *Hoffman*, Kaufmann submitted an affidavit from its principal executive, stating that it did not take title, possession, or ownership of any of the relevant linseed oil during the distribution or sales process.[44] Nonetheless, the court made clear that strict liability in Pennsylvania is properly extended "to anyone 'who enters into the business of supplying human beings with products which may endanger the safety of their persons and property.'"[45] Because Kaufmann's tasks amounted to being "in the business of selling or marketing merchandise," rather than performing a "tangential" role, it could be held strictly liable for injuries resulting from defects in that merchandise.[46]

In reaching this conclusion, the court discussed two prior Pennsylvania Supreme Court cases, both of which also inform our judgment that Amazon is subject to strict liability. The first of these is *Francioni v. Gibsonia Truck Corp.*,[47] in

---

[44] *See id.* at 1352 n.2 (citing an affidavit stating that, for all transactions involving the relevant packager, "title passed directly from [the manufacturer] to [the packager]," and that "[a]ny oil which [the packager] obtained from [the manufacturer] at the time in question was never owned by . . . E.W. KAUFMANN COMPANY.").

[45] *Id.* at 1353 (citing Restatement (Second) of Torts § 402A, cmt. f).

[46] *Id.* at 1354.

[47] 372 A.2d 736 (Pa. 1977).

which the Pennsylvania Supreme Court decided that the term "seller," as used in § 402A, does not limit strict products liability to the context of sales; that is to say, the term "seller" can also extend to lessors and bailors. The court held that strict products liability should be applied broadly to those who market products, "whether by sale, lease or bailment, for use and consumption by the public."[48]

Four years later, in *Nath v. National Equipment Leasing Corp.*,[49] the Pennsylvania Supreme Court declined to extend the application of strict product liability to financial lessors because the financial lessor's "participation in the chain of events was tangential," in such a way that it "was not able to, nor would it have been in a position to, effect or oversee the safety of the product."[50] The core of the court's logic was that "[a] finance lessor is not in the business of selling or marketing merchandise," but rather it "is in the business of circulating funds."[51]

In this case, Amazon's role extends beyond that of the *Hoffman* sales agent, who in exchange for a commission merely accepted orders and arranged for product shipments. Amazon not only accepts orders and arranges for product shipments, but it also exerts substantial market control over product sales by restricting product pricing, customer service, and communications with customers.[52] Amazon's involvement, in other words, resembles but also exceeds that

---

[48] *Id.* at 738.
[49] 439 A.2d 633 (Pa. 1981).
[50] *Id.* at 636.
[51] *Id.*
[52] JA111, JA114, JA154, JA166.

of the sales agent labeled a "seller" in *Hoffman*.

At oral argument, Amazon contended that it should not be likened to a sales agent because it lists products and collects payment on behalf of various third-party vendors, whereas a sales agent typically represents a single seller or manufacturer. This is a distinction without a difference. Pennsylvania state courts have repeatedly found that large retailers who offer a range of different products are "sellers" within the meaning of § 402A.[53] Amazon is not exempted from strict products liability simply because its website offers a variety of products.[54]

---

[53] *See, e.g.*, *Barton v. Lowe's Home Centers, Inc.* 124 A.3d 349, 352 (Pa. Super. Ct. 2015) (permitting claim against Lowes premised on it being a "seller" to proceed past demurrer stage); *Burch v. Sears, Roebuck and Co.*, 467 A.2d 615, 621, 623 (Pa. Super. Ct. 1983) (holding that Sears is a "seller," and reaffirming that, "under our products liability law, all suppliers of a defective product in the chain of distribution, whether retailers, partmakers, assemblers, owners, sellers, lessors, or any other relevant category, are potentially liable to the ultimate user injured by the defect."); *see also* Restatement (Second) of Torts § 402A, cmt. f ("The rule stated in this Section applies to . . . any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.").

[54] The dissent characterizes *Hoffman* as a "narrow exception"

C

Amazon's remaining arguments similarly fail to demonstrate that it is not subject to strict product liability in Pennsylvania.

For example, Amazon asks that we look to dictionary definitions of the word "seller" for support. However, comment f to § 402A makes clear that the term "seller" is not

to the general rule that a "'seller' in Pennsylvania is almost always an actor who transfers ownership from itself to the customer." Even assuming *arguendo* that *Hoffman* represents an "exception," Amazon falls within said exception, which Pennsylvania courts have never labeled as "narrow." The dissent claims that the *Hoffman* exception applies only to "exclusive sales representatives or exclusive agents," with "exclusive agents" often considered sellers because the agent (1) "traffics intimately in [the products]," *Bumbaugh*, 152 A.D. 2d at 72, and (2) is "bound by its exclusive sales representative contract to promote the sale of [the] products." *Bittler*, 560 N.E.2d at 982. The dissent concludes that because Amazon does not have any "exclusive" franchise in the sale of third-party products, it "clearly does not fit this description." There is one problem with the dissent's description of the so-called *Hoffman* exception: Nowhere in *Hoffman* does it state that the sales agent, E.W. Kaufmann Company, was an "exclusive" agent for the manufacturer. To the contrary, E.W. Kaufmann's ostensibly non-exclusive role as sales agent was nearly identical to that of Amazon: It received orders for the product on behalf of a third-party manufacturer and transmitted the orders to be fulfilled, never taking any right to possession or title.

25

limited by its dictionary definition, as it "applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant."[55] Amazon contends that we should construe "seller" as a person who transfers a thing that she owns to another in exchange for something of value, usually money. This concept runs squarely against Pennsylvania case law that does not require an actor to possess or hold title to an item in order to be considered a "seller" for purposes of § 402A.[56]

Amazon also relies heavily on non-controlling case law from jurisdictions other than Pennsylvania. However, in deciding whether Amazon is a "seller" within the meaning of § 402A, we must predict what the Pennsylvania Supreme Court would decide under Pennsylvania law interpreting the Second Restatement of Torts.[57] It is of little consequence whether Amazon is a "seller" for purposes of other states' statutes, as each of those statutory schemes is based on distinct language and policy considerations.[58]

---

[55] Restatement (Second) of Torts § 402A, cmt. f.

[56] *See e.g.*, *Hoffman*, 452 A.2d at 1349.

[57] *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45–46 (3d Cir. 2009) ("In the absence of a controlling decision by the Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide this case.").

[58] The dissent also cites approvingly to out-of-jurisdiction case law determining that Amazon was not subject to strict liability as a "seller." In particular, the dissent highlights cases from the Fourth Circuit, Sixth Circuit, Southern District of New York, and Northern District of Illinois, none of which should shape our analysis here. *See Erie Ins. Co. v.*

26

*Amazon.com*, No. 18-1198, 2019 WL 2195146 (4th Cir. May 22, 2019); *Fox v. Amazon*, No. 18-5661, 2019 WL 2417391 (6th Cir. June 10, 2019); *Eberhart v. Amazon, Inc.*, 325 F. Supp. 3d 393 (S.D.N.Y. 2018); *Garber v. Amazon.com, Inc.*, No. 17 C 673, 2019 WL 1437877 (N.D. Ill. Mar. 31, 2019). The Fourth Circuit case made clear that its holding turned in large part on a provision of the Maryland Uniform Commercial Code, which, of course, has no effect on Pennsylvania law. *See Erie Ins. Co.*, 2019 WL 2195146, at *4 (citing § 2-103(1)(d) of the Maryland Code of Commercial Law as a basis for its holding because it defines a "sale" as "the passing of title from the seller to the buyer for a price"). Moreover, as Judge Motz noted in her concurrence in that case, as a federal court sitting in diversity, "[g]iven the policy-intensive nature of this inquiry, the lack of on-point Maryland precedent, and Amazon's novel business model," one could not "confidently predict that Maryland courts would treat Amazon as a seller under state law." *Id.* at *7. The Sixth Circuit case was explicitly based on a Tennessee statute that applied a different test than that of § 402A of the Second Restatement, namely, whether an "individual [was] regularly engaged in exercising sufficient control over a product in connection with its sale." *Fox*, 2019 WL 2417391, at *7. Under Pennsylvania law, on the other hand, we apply the *Francioni* factors, none of which parallel the apparently single-factor Tennessee test for "sufficient control." *Id.* In the New York case, the federal district court noted that under New York law, a distributor cannot be held strictly liable for product defects unless it "at some point, own[ed] the defective product." *Eberhart*, 325 F. Supp. 3d at 398. And in the Illinois case, the district court noted that prior state cases appeared to require an "exclusivity" arrangement where an

27

Therefore, having concluded that Amazon should be considered a "seller" under § 402A of the Second Restatement of Torts, we hold that under Pennsylvania law, Amazon is strictly liable for consumer injuries caused by defective goods purchased on Amazon.com.

IV

The second issue in this appeal is whether Oberdorf's claims, both for negligence and for strict liability, including failure to provide adequate warnings regarding the use of the dog collar, are barred by § 230 of the CDA.[59] Unlike the first issue, this is a question of federal law. We conclude that the CDA bars some, but not all, of Oberdorf's claims.

The CDA states, in relevant part, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another

---

alleged seller was not involved in transferring title. *Garber*, 2019 WL 1437877, at \*7 ("The [plaintiffs] have not presented any evidence that Amazon purported to be the exclusive seller of Shenzhen hoverboards."). As noted above, in Pennsylvania, a party involved in the sales process need not own the defective product or have an exclusivity arrangement with the manufacturer to be strictly liable for product defects. *See*, *e.g.*, *Hoffman*, 452 A.2d 1349. Therefore, we do not believe these non-precedential, out-of-circuit cases should guide our reasoning. Our task is strictly limited to determining what the Pennsylvania Supreme Court would do pursuant to Pennsylvania law.

[59] *See* 47 U.S.C. § 230.

information content provider."[60] This section, sometimes referred to as the CDA "safe harbor provision,"[61] "precludes courts from entertaining claims that would place a computer service provider in a publisher's role, and therefore bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content."[62] The CDA is intended to allow interactive computer services companies "to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete."[63]

The CDA safe harbor provision was passed by Congress in the wake of a controversial New York state court decision allowing defamation claims to proceed against a website host.[64]

The crux of Amazon's argument is that Oberdorf's negligence and strict liability claims are barred because she seeks to treat Amazon as the publisher or speaker of material provided by The Furry Gang, an information content

---

[60] 47 U.S.C. § 230(c)(1).

[61] *See, e.g.*, *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1170 (9th Cir. 2009).

[62] *Green v. America Online*, 318 F.3d 465, 471 (3d Cir. 2003) (citations omitted).

[63] *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc).

[64] *See Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).

provider.[65]  Amazon contends Oberdorf's claims are essentially that Amazon should be held liable for letting The Furry Gang post the offer for the dog collar and for failing to police that offer once it was posted. Oberdorf, on the other hand, asserts that her claims do not pertain to Amazon's role in publishing third-party information but rather to its direct role in the actual sale and distribution of the defective product. That is true to a point but Oberdorf also contends that Amazon should have revised the content provided to include warnings to ensure the safe use of the dog collar. The question that we must answer is "Would such an addition to the content be part of the editorial function of the Amazon website?"

Courts throughout the country have interpreted the CDA safe harbor provision broadly.[66] Turning first to our Court, in *Green v. America Online*,[67] the plaintiff alleged that AOL had failed to properly police its chat rooms to prevent a third party from posting defamatory content that caused the plaintiff emotional distress.[68] We held that the CDA safe harbor provision barred the plaintiff's claims because he was "attempt[ing] to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its

---

[65] *See* 47 U.S.C. § 230(c)(1). "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

[66] *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016) (collecting federal appellate cases).

[67] 318 F.3d 465 (3d Cir. 2003).

[68] *Id.* at 469.

network—actions quintessentially related to a publisher's role."[69]

Other federal appellate courts have addressed related questions. For example, the First Circuit barred sex trafficking claims against a classified advertisement website because the allegations centered on the website's role in failing to regulate third-party content that led to the plaintiffs' injuries.[70] The Fifth Circuit barred negligence claims alleging that an online social network took insufficient precautions to prevent a fifteen-year-old teenager from lying about her age, thereby leading to her being contacted and sexually assaulted.[71] The Seventh Circuit barred housing discrimination claims against an online message board for permitting discriminatory posts.[72]

These cases demonstrate that claims are precluded whenever "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'"[73] Nonetheless, courts have refused to extend the scope of the CDA safe harbor provision "to immunize a party's conduct outside the realm of the Internet just because it relates to the publishing of information on the

---

[69] *Id*. at 471.

[70] *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 22 (1st Cir. 2016).

[71] *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008).

[72] *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008), *as amended* (May 2, 2008).

[73] *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), *as amended* (Sept. 28, 2009).

Internet."[74]    In *Barnes v. Yahoo!, Inc.*,[75] for example, the Ninth Circuit barred the plaintiff's negligence claims against Yahoo for failing to remove posts by her ex-boyfriend containing nude photographs of her.  However, the court held that the CDA safe harbor provision did not immunize Yahoo against the plaintiff's related promissory estoppel claim, which was based on Yahoo's promise to remove the injurious content rather than on any editorial function.[76]

While we recognize that Amazon exercises online editorial functions, we do not agree that all of Oberdorf's claims seek to treat Amazon as the publisher or speaker of information provided by another information content provider.  As previously discussed, Amazon is a "seller" of products on its website, even though the products are sourced and shipped by third-party vendors such as The Furry Gang.[77] Amazon's involvement in transactions extends beyond a mere editorial function; it plays a large role in the actual sales process.    This includes receiving customer shipping information, processing customer payments, relaying funds and information to third-party vendors, and collecting the fees it charges for providing these services.

Therefore, to the extent that Oberdorf's negligence and strict liability claims rely on Amazon's role as an actor in the sales process, they are not barred by the CDA.  However, to the extent that Oberdorf is alleging that Amazon failed to

---

[74] *Fed. Trade Comm'n v. Accusearch Inc.*, 570 F.3d 1187, 1206 (10th Cir. 2009) (Tymkovich, J., concurring).
[75] 570 F.3d 1096 (9th Cir. 2009).
[76] *Id.* at 1107–09.
[77] *See supra* Part III.

provide or to edit adequate warnings regarding the use of the dog collar, we conclude that that activity falls within the publisher's editorial function. That is, Amazon failed to add necessary information to content of the website. For that reason, these failure to warn claims are barred by the CDA.

Because the District Court did not parse Oberdorf's claims in order to distinguish between "failure to warn" claims and claims premised on other actions or failures in the sales or distribution processes, we will vacate its holding that Oberdorf's claims are barred by the CDA. To the extent that Oberdorf's claims rely on allegations relating to selling, inspecting, marketing, distributing, failing to test, or designing, they pertain to Amazon's direct role in the sales and distribution processes and are therefore not barred by the CDA safe harbor provision.[78] Those claims will be remanded to the District Court.

V

For the above reasons, we hold that (1) Amazon is a "seller" for purposes of § 402A of the Second Restatement of Torts and thus subject to the Pennsylvania strict products liability law, and (2) Oberdorf's claims against Amazon are not barred by § 230 of the CDA except as they rely upon a

---

[78] The Fourth Circuit has similarly held that the CDA does not insulate Amazon against claims based on its participation in the sale of a defective product. *See Erie Ins. Co.*, 2019 WL 2195146, at *3 ("While the Communications Decency Act protects interactive computer service providers from liability *as a publisher of speech*, it does not protect them from liability as the seller of a defective product.").

33

"failure to warn" theory of liability. We will therefore affirm the dismissal under the CDA of the failure to warn claims. We will vacate the remainder of the judgment of the District Court and remand this matter for further proceedings consistent with this opinion.

Oberdorf v. Amazon, Inc., No. 18-1041
**SCIRICA**, *Circuit Judge*, concurring in part and dissenting in part.

This case implicates an important yet relatively uncharted area of law. No Pennsylvania court has yet examined the product liability of an online marketplace like Amazon's for sales made by third parties through its platform. Our task, as a federal court applying state law, is to predict how the Pennsylvania Supreme Court would decide the case. *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45 (3d Cir. 2009). We must take special care "to apply state law and not . . . to participate in an effort to change it." *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980) (internal citation omitted). In my view, well-settled Pennsylvania products liability law precludes treating Amazon as a "seller" strictly liable for any injuries caused by the defective Furry Gang collar.

The plaintiffs weigh in detail policy reasons for allowing them to sue Amazon. Plaintiffs' theory would substantially widen what has previously been a narrow exception to the typical rule for identifying products liability defendants sufficiently within the chain of distribution. A "seller" in Pennsylvania is almost always an actor who transfers ownership from itself to the customer, something Amazon does not do for Marketplace sellers like The Furry Gang.[1] For similar reasons, every court to consider the question thus far has found Amazon Marketplace not a "seller" for

---

[1] For purposes of this opinion, "ownership" includes, in addition to legal title, other rights to possess such as lease and bailment.

products liability or other purposes; several of those courts have done so under products liability regimes similar to Pennsylvania's.[2] For these reasons, I respectfully dissent from

---

[2]     For determination under Restatement-derived common law definition of "seller," *see Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 141–42 (4th Cir. May 22, 2019) (under Maryland common law of products liability, Amazon was not a seller of a third-party seller's product because it never held title to the product); *Garber v. Amazon.com, Inc.*, --- F. Supp. 3d ---, 2019 WL 1437877, at *8 (N.D. Ill. Mar. 31, 2019) (under Illinois common law, Amazon Marketplace was not within the "chain of distribution" of a third-party seller's product, nor did it "play an integral role in the marketing enterprise" such that policy considerations would justify extending liability outside the chain of distribution) (internal citations omitted); *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 398 (S.D.N.Y. 2018) (under New York common law, Amazon Marketplace was not a seller because it was not within the product's "chain of distribution"). For determination under state common law doctrine and under state statutes whose definitions of "seller" are inconclusive, requiring consideration of common law principles, *see Fox v. Amazon.com, Inc.*, --- F.3d ---, 2019 WL 2417391, at *7 (6th Cir. June 10, 2019) (interpreting ambiguously defined Tennessee statutory term "seller" to include "any individual regularly engaged in exercising sufficient control over a product in connection with its sale, lease, or bailment, for livelihood or gain" but holding Amazon Marketplace did not meet this definition); *Carpenter v. Amazon.com, Inc.*, No. 17-3221, 2019 WL 1259158, at *5 (N.D. Cal. Mar. 19, 2019) (under California law, Amazon Marketplace was not subject to strict liability because it was

the majority's disposition of the claims not barred by the Communications Decency Act (CDA).

**I.**

Amazon is a multinational technology company. Among other ventures, it hosts online sales. Products are offered for sale at Amazon.com in three primary ways. First,

---

not "integral to the business enterprise and a necessary factor in bringing the product to market"); *Allstate N.J. Ins. Co. v. Amazon.com, Inc.*, No. 17-2738, 2018 WL 3546197, at \*6–7 (D.N.J. July 24, 2018) (Amazon Marketplace was not a seller under New Jersey statutory definition encompassing "any person who, in the course of business conducted for that purpose: sells . . . or otherwise is involved in placing a product in the line of commerce") (internal citation omitted); *Stiner v. Amazon.com, Inc.,* 120 N.E.3d 885, 891 (Ohio Ct. App. 2019) (Amazon Marketplace was not a seller under Ohio statutory definition encompassing "[a] person that, in the course of a business conducted for the purpose, sells . . . or otherwise participates in the placing of a product in the stream of commerce") (internal citation omitted); *see also Milo & Gabby LLC v. Amazon.com, Inc.*, 693 F. App'x 879, 885 (Fed. Cir. 2017) (Amazon Marketplace was not a "seller" under the Copyright Act, 17 U.S.C. § 106); *McDonald v. LG Elecs. USA, Inc.*, 219 F. Supp. 3d 533, 541–42 (D. Md. 2016) (dismissing a Maryland-law negligence claim against Amazon); *Inman v. Technicolor USA, Inc.*, No. 11-666, 2011 WL 5829024, at \*6 (W.D. Pa. Nov. 18, 2011) (holding, under Pennsylvania products liability law, eBay was not a "seller" because eBay was not "anything more than an online forum where sellers . . . may peddle their wares to buyers").

Amazon sources, sells, and ships some products as seller of its own goods. Second, third-party sellers sell products through Amazon Marketplace "fulfilled by Amazon," purchasing Amazon's services in storing and shipping their products. Third, at issue here, third-party sellers sell products through Amazon Marketplace without additional "fulfillment" services. These sellers, like The Furry Gang, supply and ship products directly to consumers without ever placing the items in Amazon's possession.

Amazon Marketplace has grown enormously in recent years. Over a million businesses of all sizes sell products on Amazon Marketplace, according to Amazon's own figures, and "small and medium-sized businesses selling in Amazon's stores now account for 58 percent of [Amazon's] sales." Amazon, 2019 Amazon SMB Impact Report 1, 3, https://d39w7f4ix9f5s9.cloudfront.net/61/3b/1f0c2cd24f37b d0e3794c284cd2f/2019-amazon-smb-impact-report.pdf (last accessed June 17, 2019). These businesses and their products are diverse: a recent profile of highly successful Amazon Marketplace sellers included businesses offering beauty products, indoor gardening kits, and an educational toy teaching coding. Kiri Masters, *4 Companies Founded By Millennials That Are Making Millions on Amazon*, Forbes (Aug. 9, 2018), http://www.forbes.com/sites/kirimasters/ 2018/08/09/4-companies-founded-by-millennials-who-are- selling-millions-on-amazon. Amazon Marketplace and other online platforms give consumers the ability to buy from small and large businesses whose products they may never have encountered in an ordinary physical store.

Amazon envisions its Marketplace as an open one. It reserves the right to remove sellers' listings or terminate

4

Marketplace services for any reason and requires sellers to represent they are in good legal standing, but it does not apply a general vetting process to all sellers to identify those who do not in fact meet that standard. Amazon also does not narrow the Marketplace's offerings by limiting the number of sellers who may offer each type of product: any number of sellers may register. In displaying products to customers, Amazon distinguishes products sold through the Marketplace from those sold directly by Amazon, identifying the seller responsible for the item in a "sold by" line placed prominently next to the price and shipping information. App. 211. The seller's name also appears on the order confirmation page, before the customer clicks "place your order" to finalize the purchase. *Id.* Amazon's conditions of use for customers affirm the distinction, explaining, in Amazon Marketplace purchases from third-party sellers, "you are purchasing directly from those third parties, not from Amazon. We are not responsible for examining or evaluating, and we do not warrant, the offerings of any of these businesses or individuals." Appellee's Br. 4 (citing Amazon, *Conditions of Use*, http://www.amazon.com/gp/help/customer/display. html/ref=footer %20cou?ie=UTF8&nodeId=508088 (last updated May 21, 2018)).

A customer on Amazon Marketplace buys a product that has been chosen, sourced, and priced by the third-party seller. The seller contractually commits to "ensure that [it is] the seller of each of [its] Products" listed for sale. App. 164. In exchange for Amazon's services including listing the product and managing payments, the seller is charged a monthly fee, as well as a referral fee of a percentage of each sale made. The relationship reflected in the agreement between Amazon and the seller is one of "independent contractors." *Id.* at 270. The

5

agreement specifically disclaims other potential relationships: it does not mean to create relationships of "partnership, joint venture, agency, franchise, sales representative, or employment," nor does it create an "exclusive relationship" constraining either Amazon or the third-party seller from other sales relationships. *Id.*

For each new listing a seller creates, the seller identifies the product it plans to sell, designates a price, and writes a product description. Amazon requires the description include certain minimum information about the product, and requires the seller to offer a price as favorable as the one it offers in any other sales channels. Amazon also automatically formats the information provided into a product listing page matching others on the Marketplace, and it sometimes modifies listings to streamline user experience: for example, by grouping together the pages of multiple sellers who offer the identical product sourced in different ways. The seller may choose to offer, or not to offer, a warranty on its product. Regardless, the agreement makes the seller "responsible for any nonconformity or defect in, or any public or private recall of, any of [its] products." *Id.* at 173.

**II.**

When a product is sold on Amazon Marketplace, the third-party seller offering the product for sale, as well as the product's original manufacturer, may each be sued in product liability if the product is defective. This case raises the question whether Amazon, too, can be liable as a "seller" of such a product, because of the assistance it gives to the third-party seller that provided the product to the customer. Plaintiffs answer this question in part by invoking a set of four policy

6

factors laid out in *Francioni v. Gibsonia Truck Corp.*, 372 A.2d 736, 739 (Pa. 1977). For the reasons I discuss in Part III, the *Francioni* factors should come second to an analysis under Pennsylvania law of the defendant's role in supplying the product. *See Cafazzo v. Cent. Med. Health Servs.*, 668 A.2d 521, 523 (Pa. 1995). I begin, instead, with the definition of "seller" under Pennsylvania law.

**A.**

A seller under Pennsylvania product liability law is one "engaged in the business of selling . . . a product." *Id.* at 523 (quoting Restatement (Second) of Torts § 402A(1)(a) (Am. Law Inst. 1965)). In nearly all cases, "selling" entails something Amazon does not do for Marketplace products: transferring ownership, or a different kind of legal right to possession, from the seller to the customer. Thus, in Pennsylvania, sellers include traditional wholesalers and retailers, as well as those who supply a product through a transaction other than a sale. *See, e.g.*, *Chelton v. Keystone Oilfield Supply Co.*, 777 F. Supp. 1252, 1256 (W.D. Pa. 1991) (wholesaler); *Burch v. Sears, Roebuck & Co.*, 467 A.2d 615, 618 (Pa. Super. Ct. 1983) (retailer); *Francioni*, 372 A.2d at 739–40 (lessor); *Villari v. Terminix Int'l, Inc.*, 663 F. Supp. 727, 730–31 (E.D. Pa. 1988) (pest control company supplying insecticide as part of service). Though varied, each of these cases holds liable a "seller" who transferred the right to possess the product from itself to the customer.

Transfer of a right to possession is so typical to "sellers" that exceptions are rare. There is one primary exception in Pennsylvania caselaw: the "manufacturer's representative." *See Hoffman v. Loos & Dilworth, Inc.*, 452

7

A.2d 1349, 1351 (Pa. Super. Ct. 1982). *Hoffman* reversed a grant of summary judgment for the defendant and held a "manufacturer's representative" could be strictly liable. *Id.* at 1354–55. A manufacturer's representative, also termed "sales agent" or "manufacturer's agent," is a salesperson who helps a manufacturer expand sales by representing a product, usually in a particular region for a period of time, promoting the product to retailers or directly to customers.[3] After evaluating this uniquely involved retail role, the Superior Court of Pennsylvania concluded it was much more than "tangential," and the sales agent could be held liable as a seller. *Id*. at 1354.

But in no other scenario has a Pennsylvania court imposed "seller" liability on a defendant whose role in the sale did not include transferring ownership or possession of the product. For example, the Pennsylvania Supreme Court considered and rejected "seller" liability for an auctioneer who "never owned, operated or controlled the equipment which was to be auctioned." *Musser v. Vilsmeier Auction Co.*, 562 A.2d 279, 279 (Pa. 1989). As the court explained, in auctioning off a product owned and controlled by the third-party seller, "[t]he

---

[3] *See A Dictionary of Business and Management* 377 (Jonathan Law ed., 6th ed. 2016) (defining "manufacturer's agent" as "[a] commission agent who usually has a franchise to sell a particular manufacturer's products in a particular country or region for a given period"); Charles Cohon, *Top Considerations When Hiring Manufacturers' Reps*, Manufacturers' Agents National Association, http://www.manaonline.org/manufacturers/topconsiderations-when-hiring-manufacturers-reps (last visited May 9, 2019) (describing manufacturer's representatives as a kind of "outsource[d] . . . sales force").

auction company merely provided a market as the agent of the seller. . . . Selection of the products was accomplished by the bidders, on their own initiative and without warranties by the auction company." *Id.* at 282. The auction company's significant role in assisting the sale was nonetheless "tangential" to the core of the transaction, the exchange between the buyer and third-party seller. *Id*. Similarly "tangential" was the role of the financer of a sale, who, although technically temporary owner and lessor of the supplied product, participated only by "offering the use of money." *Nath v. Nat'l Equip. Leasing Corp.*, 439 A.2d 633, 636 (Pa. 1981) (quoting *Francioni*, 372 A.2d at 740 n.3). Pennsylvania courts would not hold liable as sellers such tangential actors as shopping malls renting space to retailers, credit card companies that enable sales transactions, or newspapers or websites hosting classified ads. *See generally* 3 Summ. Pa. Jur. 2d Torts § 41:61 (2d ed. 1998).

Amazon Marketplace, like the auctioneer in *Musser*, takes an important part in assisting sales, but is "tangential" to the actual exchange between customer and third-party seller. 562 A.2d at 282. Like an auctioneer, Amazon Marketplace provides the "means of marketing" to a third-party seller who accomplished the "fact of marketing" when it "chose the products and exposed them for sale." *Id*. (citing *Francioni*, 372 A.2d at 738). Amazon Marketplace's services to any individual seller for an individual product are not "undertaken specifically," but rather, as with the auctioneer, provided on essentially similar terms to a large catalogue of sellers. *Id.*; *see id*. at 282 n.3. And like an auctioneer, Amazon Marketplace never owns, operates, or controls the product when it assists in a sale. *See id.* at 279.

Amazon Marketplace's similarities to the auctioneer emphasize it has little in common with *Hoffman*'s manufacturer's representative, the only kind of "seller" held liable despite not having made a transfer of ownership or possession rights. *Hoffman*, 452 A.2d at 1354. Amazon Marketplace does not offer the co-strategizing relationship promised by manufacturers' representatives. Amazon Marketplace is not an outsourced sales force working with individual manufacturers to boost sales: it offers a marketing platform, and it is up to the third-party seller to make best use of the platform to maximize sales.

Under Pennsylvania law, then, Amazon was not the seller of The Furry Gang's product and therefore is not liable for any product defect. Because established Pennsylvania law precludes holding Amazon strictly liable here, I respectfully dissent.

**B.**

While Pennsylvania law alone dictates this outcome, it is reinforced by "analogous decisions" and "other reliable data." *McKenna*, 622 F.2d at 663. Pennsylvania courts have yet to consider whether Amazon is strictly liable for defective products sold through its Marketplace. So just like a Pennsylvania court would, I consider relevant decisions from other jurisdictions. These sources, including two federal appellate decisions so far, confirm what Pennsylvania law already makes clear. Amazon's role in assisting a product's sale does not make it that product's "seller."

The Sixth Circuit found Amazon Marketplace was not a "seller" after consulting a variety of sources to clarify the

term's expansive but ambiguous meaning within the Tennessee Products Liability Act. *Fox v. Amazon.com, Inc.*, --- F.3d ---, 2019 WL 2417391, at \*5–7 (6th Cir. June 10, 2019). The Tennessee statute defines "seller" as "any individual or entity engaged in the business of selling a product," including a "retailer," "wholesaler," "distributor," "lessor," or "bailor." Tenn. Code Ann. § 29-28-102(7) (West 2012). Considering and rejecting a more "limited construction" proposed by Amazon, *Fox*, 2019 WL 2417391, at \*5, the court interpreted this definition to include not only those who transfer title, but "any individual regularly engaged in exercising sufficient control over a product in connection with its sale, lease, or bailment, for livelihood or gain," *id.* at \*7. The court nonetheless found Amazon Marketplace did not fall within even this more expansive definition. The court held Amazon did not exercise sufficient control to be the product's "seller" because Amazon "did not choose to offer the [product] for sale, did not set the price of the [product], and did not make any representations about the safety or specifications of the [product] on its marketplace." *Id.* at \*7. It noted that, as in this case, Amazon did not fulfill the product and therefore never possessed it or shipped it to the customer. *Id.*

Even where Amazon Marketplace did fulfill the product at issue, the Fourth Circuit held Amazon was not the product's "seller" under Maryland common law. *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 144 (4th Cir. May 22, 2019).[4]

---

[4] In Maryland, as in Pennsylvania, product liability is governed by common law. *See* Maryland State Bar Association, *Maryland Product Liability Law* § 1.1 (2d ed. 2003). Contrary to the majority's characterization, the court's

In that case, unlike this one, Amazon "fulfilled" the product by storing it prior to sale then shipping it to the customer. The court held Amazon Marketplace was not a seller because, despite its role in "fulfilling" the sale, it never performed the basic act of sale: it did not "transfer title to purchasers of [the product] for a price." *Id.* at 141. The court explained, relying in part on Pennsylvania precedent, those who "own . . . the products during the chain of distribution are sellers," while those who "render services to facilitate that distribution or sale[] are not sellers." *Id.* (citing *Musser*, 562 A.2d at 283). Amazon, because it only rendered services and did not transfer ownership, was not a seller. *Id.* at 144.[5] Here, Amazon played an even more limited role: it neither stored nor shipped the product.

Other federal courts have reached the same outcome. Courts have declined to treat Amazon Marketplace as a "sales agent," as plaintiffs ask us to do. In dismissing a products liability lawsuit against Amazon essentially identical to this

decision in *Erie* did not turn on a Maryland statute, but rather consulted a potentially analogous statutory provision alongside other sources including dictionary definitions and out-of-state persuasive authority to infer the common law meaning of "seller." 925 F.3d at 141.

[5] Maryland differs from Pennsylvania in declining to hold liable those who transfer possession through a transaction other than a sale, such as lessors and bailors. *See Maryland Product Liability Law* § 4.8. For that reason, the *Erie* court defined "sellers" as transferors of title and did not discuss transfer of another kind of right to possess the product. 925 F.3d at 141. Because no such non-sale transaction is at issue in this case, however, Maryland and Pennsylvania law are analogous, and *Erie*'s analysis is informative.

one, the District Court for the Southern District of New York considered a New York case that, like Pennsylvania's *Hoffman* decision, held a sales agent liable as a "seller." *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 398–99 (S.D.N.Y. 2018) (citing *Brumbaugh v. CEJJ, Inc.*, 547 N.Y.S.2d 699, 700–01 (App. Div. 3d Dep't 1989)); *see Hoffman*, 452 A.2d at 1354. The court found *Brumbaugh* exceptional and of no help in establishing liability against Amazon. *Eberhart*, 325 F. Supp. 3d at 398–99. It reasoned, among New York cases holding defendants liable as sellers, "the vast majority of opinions" involve a defendant who did "at some point, own the defective product." *Id*. at 398. And while *Brumbaugh*'s sales agent, given its exclusive role in connecting the manufacturer with local distributors, was "a mandatory link in [the] distributive chain," *id.* at 399 (quoting *Brumbaugh*, 547 N.Y.S.2d at 701), the court found Amazon Marketplace's role in merely "facilitating purchases" did not rise to this level. *Id.*

The Northern District of Illinois adopted similar reasoning in rejecting Amazon's liability. *Garber v. Amazon.com, Inc.*, --- F. Supp. 3d ---, 2019 WL 1437877, at *7 (N.D. Ill. Mar. 31, 2019). The court identified and analyzed the few Illinois cases in which parties who never owned the product were nonetheless held liable. It found Amazon Marketplace resembled neither a manufacturer's representative, nor a broker who made direct agreements with customers to sell the product and held exclusive rights to do so. *Id.* at *7–9 (discussing *Hammond v. N. Am. Asbestos Corp.*, 454 N.E.2d 210, 216 (Ill. 1983), and *Bittler v. White & Co.*, 560 N.E.2d 979, 981 (Ill. App. Ct. 1990)). Amazon was not liable for third-party sales because "[the third-party seller], not Amazon, owned the [product], sourced it and listed it for sale on Amazon's marketplace, and sold and shipped it directly to

13

the [customers]." *Id.* at *7. Moreover, unlike the more involved defendants held to be sellers, Amazon's "'major role' was providing a venue and marketplace for third-party sellers . . . to connect with buyers." *Id*. at 8.[6] This consensus among courts analyzing common law analogous to Pennsylvania's confirms that Amazon's limited role in Marketplace sales does not make it a "seller" liable for defective products.

The Third Restatement of Torts' § 20, defining "seller," captures state law trends in Pennsylvania, common also to New York, Illinois, and other states, as federal courts considering product liability suits against Amazon Marketplace have noted. *See* Restatement (Third) of Torts: Prod. Liab. § 20 (Am. Law Inst. 1998); *see also, e.g.*, *Eberhart*, 325 F. Supp. 3d at 398 & n.4 (finding its conclusion against product liability for Amazon Marketplace "reinforced" by § 20, though New York had not adopted the provision). Although the Supreme Court of Pennsylvania has not yet had occasion to consider § 20, the provision's incremental clarification of existing law, fully consistent with Pennsylvania case law, is the kind of guidance the Pennsylvania Supreme Court would likely find informative.

---

[6] *See also Allstate N.J. Ins. Co. v. Amazon.com, Inc.*, No. 17-2738, 2018 WL 3546197, at *5–12 (D.N.J. July 24, 2018) (Amazon Marketplace did not resemble a broker who exercised control over a product by taking title to it; it instead resembled a broker who never exercised control and was thus not a "seller"); *Stiner v. Amazon.com Inc.*, 120 N.E.3d 885, 892 (Ohio Ct. App. 2019) (distinguishing Amazon Marketplace from the consignee who took possession of an item before putting it up for auction; Amazon Marketplace more closely resembled the auctioneer and was thus not a "seller").

In explaining the parameters of seller liability, § 20 reinforces and builds on the Second Restatement's analogous definition. Under the Second Restatement, a seller is one who is "engaged in the business of selling products for use or consumption." Restatement (Second) of Torts § 402A cmt. f. This definition distinguishes the non-liable occasional seller from the liable regular seller, but it offers no help in determining what kind of involvement in a sale might be considered selling. The Third Restatement analyzes intervening case law to specify that a seller is one who "transfers ownership . . . either for use or consumption," or, alternately, one who "otherwise distributes a product" by providing that product "in a commercial transaction other than a sale." Restatement (Third) of Torts: Prod. Liab. § 20.[7] Amazon Marketplace does not transfer ownership of third-party products, so it is not a seller. In its commentary, the Third Restatement also addresses the situation of businesses participating in a sale who do not themselves do the work of transferring title. These actors are "product distribution facilitators," meaning those "[p]ersons assisting or providing services to product distributors, while indirectly facilitating the commercial distribution of products." *Id.* cmt. g. In general, product distribution facilitators are not liable as sellers. *Id.*

---

[7] In defining "one who otherwise distributes a product," the provision further specifies, "[c]ommercial nonsale product distributors include, but are not limited to, lessors, bailors, and those who provide products to others as a means of promoting either the use or consumption of such products or some other commercial activity." Restatement (Third) of Torts: Prod. Liab. § 20. No such nonsale distributor is at issue in this case because the relevant transaction was a sale.

15

reporter's note g (citing *Musser*, 562 A.2d at 283). Amazon Marketplace fits the description of a product distribution facilitator, so it would not qualify as a seller.

The Third Restatement includes the *Hoffman* exception to the general rule for product distribution facilitators: exclusive sales representatives or exclusive agents are often considered sellers because the agent "traffics intimately in [the products]," *Brumbaugh*, 547 N.Y.S.2d at 701, and is "bound by its exclusive sales representative contract . . . to promote the sale of [the] products," *Bittler*, 560 N.E.2d at 982. *See* Restatement (Third) of Torts: Prod. Liab. § 20 reporter's note g; *see also Hoffman*, 452 A.2d at 1354. Moreover, where the agent's franchise to sell the product is exclusive, meaning the agent is entitled to coordinate all sales of the product for a period of time in a particular region, then the agent is "a mandatory link in [the] distributive chain," cementing the rationale for its liability. *Brumbaugh*, 547 N.Y.S.2d at 701.[8] As noted, *see supra* pp. 8–9, Amazon Marketplace clearly does not fit this description.

The Pennsylvania Supreme Court explained in *Tincher v. Omego Flex, Inc.* that it would "adopt[] . . . sections of a restatement . . . if the cause of action and its contours are consistent with the nature of the tort and Pennsylvania's traditional common law formulation." 104 A.3d 328, 354 (Pa.

---

[8]    "Exclusive" sales agents may represent a variety of products; they are exclusive agents for a particular product if they obtain exclusive rights from a manufacturer to sell the product for a period of time in a designated region. *See, e.g.*, *Brumbaugh*, 547 N.Y.S.2d at 701.

16

2014) (internal quotation mark omitted).[9] Pennsylvania's

[9]    *See also Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 20 A.3d 468, 479 (Pa. 2011) (adopting the Second Restatement of Torts § 772 because "the formulation is consistent with the very nature of the tort, and with Pennsylvania law"); *Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270, 285 (Pa. 2005) (adopting the Second Restatement of Torts § 552, because the provision "is consistent with Pennsylvania's traditional common law formulation of the tort"); *Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966) (adopting the Second Restatement of Torts § 402A).

By contrast, the Pennsylvania Supreme Court explained it would not adopt sections of a restatement "unmoored from existing common law" and whose adoption would "produce such a policy shift that it amounts in actuality or public perception to a derogation of legislative authority." *Tincher*, 104 A.3d at 354. On these grounds, the Pennsylvania Supreme Court declined to adopt certain provisions of the Third Restatement of Torts that did not meet this standard because those provisions made a major revision to the traditional strict liability standard. Specifically, the provisions in question instituted a new requirement for design defect cases, requiring plaintiffs show the existence of a reasonable alternative safer design, rather than treating alternative design as one non-determinative factor among others. *Id.* at 346, 393–94 (discussing the Third Restatement of Torts: Products Liability § 2(b) and related provisions, §§ 1 through 7, implementing the alternative design element). The court found these provisions an "inaccurate" representation of existing Pennsylvania law

approach is to evaluate "sections of a restatement" rather than adopting or rejecting the entire document. *Id.* at 339. In excluding most sales facilitators from products liability but making an exception for sales agents, Pennsylvania case law matches § 20 of the Third Restatement, meeting *Tincher*'s standard. Under Pennsylvania law, as in § 20, an actor who assists a sale, but does not directly transfer ownership or possession, is in nearly all cases not a "seller" of the product. *Compare* 3 Summ. Pa. Jur. 2d Torts § 41:60–61, *with* Restatement (Third) of Torts: Prod. Liab. § 20 reporter's note g. Under Pennsylvania law, as in § 20, one kind of sales facilitator may nonetheless be a "seller": a sales agent, who personally represents the manufacturer in advocating for the product's sale, and may have an exclusive right to facilitate the product's sale for a period of time within a geographic area. *Hoffman*, 452 A.2d at 1354–55; Restatement (Third) of Torts:

---

and believed them in potential conflict with important "general principles" of Pennsylvania products liability. *Id.* at 399, 397.

While the provisions rejected in *Tincher* departed significantly from the Second Restatement and from state law developed in its framework, as observers note, other "provisions of the *Restatement Third* simply do as promised; they restate the current law." Vicki MacDougall, *The Impact of the Restatement (Third), Torts: Products Liability (1998) on Product Liability Law*, 6 Consumer Fin. L. Q. R. 105, 106 (2008). Provisions more modest than those rejected therefore may in some instances fulfill the intended purpose of Restatement guidance in Pennsylvania law: not "supplanting" Pennsylvania's "traditional approach" but "rather . . . clarifying the contours of the tort." *Bilt-Rite*, 866 A.2d at 287.

18

Prod. Liab. § 20 reporter's note g. Because § 20 is "consistent with the nature of the tort and Pennsylvania's traditional common law formulation," it is likely the provision would inform the Pennsylvania Supreme Court's analysis of the question at issue in this case. *Tincher*, 104 A.3d at 354.

In Pennsylvania, as in states across the country including New York and Illinois, a business assisting a sale is not a "seller" for products liability purposes unless it takes on the particularly involved retail relationship of sales agent/manufacturer's representative.[10] The Third Restatement's § 20 tracks this pattern. Like every federal court to consider this issue so far, I would find Amazon Marketplace not a seller.

## III.

To deem Amazon a "seller" of Marketplace products, plaintiffs rely in large part on a four-factor policy test first articulated in *Francioni v. Gibsonia Truck Corp.*, 372 A.2d 736, 739 (Pa. 1977). More recently, though, the Pennsylvania Supreme Court has clarified the *Francioni* test's purpose and limited applicability, making it evident the test has no role in

---

[10] In *Hoffman*, the court did not discuss whether the sales agent at issue had an exclusive franchise to sell within a particular territory or a nonexclusive franchise. *See* 452 A.2d at 1351. *Hoffman*, then, is consistent with cases requiring exclusivity to hold sales agents liable but does not create such a requirement itself. Regardless, for the reasons discussed above, *see supra* pp. 8–9, Amazon does not resemble a sales agent with either an exclusive or a nonexclusive franchise to market products.

19

answering the question at issue here. *See Cafazzo v. Cent. Med. Health Servs.*, 668 A.2d 521, 525 (Pa. 1995).

## A.

As the Pennsylvania Supreme Court has explained, the *Francioni* test guides "whether a particular supplier of products, whose status as a supplier is already determined, is to be held liable for damages caused by defects in the products supplied." *Id.* at 525. *Cafazzo* makes clear the *Francioni* test should not be used to determine whether, in the first place, a particular defendant is a supplier of the product: that question is a "precondition necessary for application of this analysis." *Id.* That question must be answered by considering "what is being done" by the defendant, and whether the activity constitutes supplying products. *Id.* at 524.

No one disputed that the *Francioni* defendant, who was a lessor of hauling equipment, had supplied the equipment that caused the plaintiff's injury. 372 A.2d at 737. The issue, instead, was whether supplying equipment via a lease made the defendant a "seller," even though the transaction was not technically a sale. *Id.* The Pennsylvania Supreme Court identified four policy factors which, in other jurisdictions, had served to justify including lessors as "sellers" for products liability purposes:

> (1) In some instances the lessor, like the seller, may be the only member of the marketing chain available to the injured plaintiff for redress; (2) As in the case of the seller, imposition of strict liability upon the lessor serves as an incentive to safety; (3) The lessor will be in a better position

20

than the consumer to prevent the circulation of defective products; and (4) The lessor can distribute the cost of compensating for injuries resulting from defects by charging for it in his business, [i].e., by adjustment of the rental terms.

*Id.* at 739.

Because the equipment leasing company was in the business of supplying products via lease, and because of the four identified policy factors, the court held the equipment leasing company should be considered a "seller." *Id.* at 739–40. Similarly, though reaching the opposite outcome, the Pennsylvania Supreme Court applied the *Francioni* test to a pharmacy defendant, holding, although the pharmacy had supplied drugs to patients, policy factors would counsel against imposing strict product liability on the pharmacy. *Coyle v. Richardson-Merrell, Inc.*, 584 A.2d 1383, 1387 (Pa. 1991).

The Pennsylvania Supreme Court has also cited the *Francioni* test as additional support for its holding, after determining that a potential defendant was not a "supplier." *See Musser*, 562 A.2d at 281; *Nath*, 439 A.2d at 634. In each case, the court analyzed the activities of the defendant, and found them too "tangential" to the actual sale of the product to support seller liability. *Musser*, 562 A.2d at 282; *Nath*, 439 A.2d at 636. The court then applied the *Francioni* factors and found, in each case, policy considerations did not support seller liability, either. *Musser*, 562 A.2d at 282–83; *Nath*, 439 A.2d at 635–36.

*Cafazzo* clarifies the relationship between the two holdings present in each of these cases, establishing that policy

21

factors alone cannot create seller liability. In *Cafazzo*, the court held a hospital and physician were not suppliers of a medical device they provided to a patient, accompanied by a surcharge for the device, because "the relationship of hospital and/or doctor to patients is not dictated by the distribution of such products, even if there is some surcharge on the price of the product." 668 A.2d at 524.

As *Cafazzo* makes evident, once a court has determined a defendant is too "tangential" to be considered a supplier of the product at issue, applying the *Francioni* policy factors is unnecessary. *Id.* at 523–24. Courts may nonetheless discuss them in order to demonstrate that, "even assuming that [the defendants] could reasonably be termed sellers . . . the policy reasons for strict liability are not present." *Id.* at 525. For the reasons already discussed, Amazon Marketplace is too tangential to third-party sales of products to be considered a supplier or seller of those products under Pennsylvania law. The *Francioni* policy factors therefore cannot establish seller liability.

**B.**

Even if Amazon Marketplace could be considered a supplier, application of the *Francioni* factors would not result in liability. Indeed, the policy outcomes produced by liability for Amazon Marketplace closely resemble those produced by liability for an auctioneer, as in *Musser*. *See* 562 A.2d at 282–83. Thus, for reasons very similar to those identified in *Musser*, the *Francioni* policy factors do not support strict product liability for Amazon Marketplace.

The first factor, availability of other members of the distribution chain, weighs in Amazon's favor, just as in

*Musser*. The *Musser* court found the first factor did not support liability for the auctioneer because, "in an auction there is a seller, who is served by the auctioneer." *Id.* at 282 (footnote omitted). Whereas in *Francioni*, the defendant lessor leased the product directly to the customer and the court identified no other member of the marketing chain, *see* 372 A.2d at 739, all Amazon Marketplace products are sold by third-party sellers who are available to be sued. That seller may be defunct, insolvent, or impossible to locate by the time of suit, just as the seller of an auctioned product may be. But as the Pennsylvania Supreme Court noted in applying this factor, "[t]o assign liability for no reason other than the ability to pay damages is inconsistent with our jurisprudence." *Cafazzo*, 668 A.2d at 526.[11]

The second two factors, the potential incentive to safety and the defendant's relative ability to prevent circulation of the products, weigh in favor of Amazon, as they did in *Musser*. In *Musser*, the court considered the auctioneer's current business model, finding the auctioneer was "not in the business of designing and/or manufacturing any particular product," nor did the auctioneer attempt to create the kind of "ongoing relationship" with any of its large catalogue of sellers "which might equip the auctioneer to influence the manufacturing process." 562 A.2d at 282. The auctioneer was not the kind of seller who makes it "his business to know the product he sells." *Id.* at 283. Similarly, Amazon Marketplace is "not in the

---

[11]     As *Musser* makes clear, the relevant question is whether alternate legally responsible members of the distribution chain exist, not whether the other members are solvent and able to pay. *See* 562 A.2d at 282.

23

business" of choosing, monitoring, or influencing third-party sellers' products or their manufacturing processes. *Id.*[12] Rather, the current model of Amazon Marketplace is an open one. All sellers meeting Amazon's terms may offer their products, and the same general terms apply to all. Although Amazon reserves the right to eject sellers, the company does not undertake to curate its selection of products, nor generally to police them for dangerousness. As it operates now, Amazon Marketplace does not exercise, relative to the consumer, any greater "influence in the manufacture of safer products." *Id.* Though it is possible to envision, as plaintiffs do, a new model for Amazon Marketplace in which the company researches products for potential defects and polices sellers to ensure they do not offer them, such a model would be fundamentally different from the Amazon Marketplace that exists now. Indeed, nearly any sales facilitator, including an auctioneer, could transform itself by creating a system to research sellers, and excluding those deemed unfit, instead of serving all comers meeting its terms. This kind of transformation, though, would have costs as well as benefits, for small entrepreneurs who might be excluded as too risky, and for consumers whose access to all goods would likely be reduced with greater scrutiny of sellers. Under *Musser*, Pennsylvania products liability law does not demand a sales facilitator enter a fundamentally new business model simply because it could.

---

[12] The majority argues third-party sellers are in a poor position to monitor product dangerousness, because they communicate with customers through Amazon Marketplace's platform and receive access to customer ratings of their products which are also made public. But it is not clear what obstacle the Marketplace platform's collation and formatting would present to sellers monitoring customer feedback.

Just as in *Musser*, the final factor, Amazon's ability to pass on the costs of product liability suits by charging all sellers more, is the only one weighing in favor of imposing liability. But because a variety of market participants could take on this insurer role if they chose, even if only peripherally involved in the sale, the fourth factor is not determinative. As the *Musser* court explained, where the other three policy factors are not present, imposing strict liability "would be related to the purpose of the policy considerations underlying the [Second Restatement of Torts § 402A] only marginally." *Id.*

Because Amazon Marketplace is not a "supplier" of third-party products, our inquiry must end there under *Cafazzo*. 668 A.2d at 525. Even were we to apply the *Francioni* policy test, though, its four policy factors also counsel against liability.

## IV.

For these reasons, I respectfully dissent from the majority opinion as to plaintiffs' products liability claims not barred by § 230 of the CDA and would affirm the District Court's dismissal of those claims.[13]

---

[13] I concur in the majority's thoughtful analysis of the CDA's application to plaintiffs' claims.